**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No: 1:23-cv-01168-SP

SUSAN OWEN-BROOKS, on behalf of herself and all others similarly situated,
SUZANNE COOK, on behalf of herself and all others similarly situated,
CRYSTAL BANE, on behalf of herself and all others similarly situated,
REBECCA DOUGHERTY, on behalf of herself and all others similarly situated, and
JADA LOONEY, on behalf of her three minor children, M.L., J.L., and S.L., and all others
similarly situated,

       Plaintiffs,

v.

DISH NETWORK CORPORATION, a Nevada Corporation,

       Defendant.

---

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

---

Plaintiffs Susan Owen-Brooks, Suzanne Cook, Crystal Bane, and Rebecca Dougherty,

individually and on behalf of all similarly situated persons, and Jada Looney on behalf of her three

minor children, M.L., J.L., and S.L., and all similarly situated persons (collectively, "Plaintiffs"),

allege the following against DISH Network Corporation ("DISH" or "Defendant") based upon

personal knowledge with respect to themselves and on information and belief derived from, among

other things, investigation of counsel and review of public documents as to all other matters:

**INTRODUCTION**

1.    Plaintiffs bring this class action against DISH for its failure to properly secure and

safeguard Plaintiffs' and other similarly situated DISH current and former customers', employees',

and employees' family members' personal information from hackers.

2.      DISH, based in Englewood, Colorado, is a satellite television company that serves nearly 10 million customers from around the country.  According to news reports, "this widespread outage hit Dish.com, the Dish Anywhere app, Boost Mobile (a subsidiary owned by Dish Wireless), and other websites and networks owned and operated by Dish Network."[1]

3.      In a Form 8-K filed with the Securities and Exchange Commission on or about February 28, 2023 the company announced, "a network outage that affected internal servers and IT telephony" and that the company "became aware that certain data was extracted from the Corporation's IT systems as part of this incident[,]" which possibly "includes personal information."[2]

4.      On or about March 14, 2023, DISH emailed customers notifying them of a hacking incident in which data including personal information was compromised.

5.      This email confirmed that on February 23, DISH experienced a cybersecurity incident. In the email DISH stated that on February 27, DISH it "became aware that certain data was extracted from our IT systems as part of this incident" (the "Data Breach"). In response, the company says that it began an investigation which is ongoing.

6.      On or about May 15, 2023, DISH sent letters to its current and former employees notifying them of the same Data Breach and the resulting compromise of their (and their family members') highly sensitive personal information.

---

[1] *See* https://www.bleepingcomputer.com/news/security/dish-network-confirms-ransomware-attack-behind-multi-day-outage/ (last visited on May 25, 2023)

[2] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001001082/000155837023002254/dish-20230223x8k.htm (last visited on May 25, 2023).

7.     According to news reports, the incident was a "ransomware attack on the Corporation's employees, customers, business, operations or financial results" carried out by a Russian ransomware gang by the name of "Black Basta."[3]

8.     Upon information and belief, the information compromised in the Data Breach included highly sensitive data that represents a gold mine for a ransomware gang like Black Basta, including "Class Members" (defined below) names, dates of birth, addresses, email addresses, Social Security numbers, driver's license or state identification card numbers, credit card or account information, vaccination records, health insurance information, and financial account numbers (collectively the "Private Information") that DISH collected and maintained.

9.     Armed with the Private Information accessed in the Data Breach, and a head start, data thieves can commit a variety of crimes against Plaintiffs and Class Members including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

10.     Therefore, Plaintiffs and Class Members will show that they have suffered ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

---

[3] *See* https://www.bleepingcomputer.com/news/security/dish-network-confirms-ransomware-attack-behind-multi-day-outage/ (last visited on May 25, 2023).

11.     Plaintiffs bring this class action lawsuit to address DISH's inadequate safeguarding of Class Members' Private Information that it collected and maintained.

12.     The potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to DISH, and thus DISH was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

13.     DISH failed to properly monitor the computer network and systems that housed the Private Information. Had DISH properly monitored its networks, it could have prevented the Data Breach from occurring or at least discovered the Data Breach sooner.

14.     Plaintiffs' and Class Members' identities, including the identities of minors, are now at risk because of DISH's negligent conduct since the Private Information that DISH collected and maintained is now in the hands of cybercriminals and other unauthorized third parties.

15.     Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

16.     Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to DISH's data security systems, future annual audits, and adequate credit monitoring services funded by DISH.

### PARTIES

17.     Plaintiff Susan Owen-Brooks ("Plaintiff Owen-Brooks" or the "Customer Plaintiff") is, and at all times mentioned herein was, an individual citizen of the State of North

Carolina. Plaintiff Owen-Brooks is a customer of DISH who was informed by DISH that her information was compromised in the Data Breach.

18.     Plaintiff Suzanne Cooke ("Plaintiff Cooke") is, and at all times mentioned herein was, an individual citizen of the State of Florida. Plaintiff Cook is a current employee of DISH who was informed by DISH that her Private Information was compromised in the Data Breach.

19.     Plaintiff Crystal Bane ("Plaintiff Bane" and, with Plaintiff Cooke, also referred to herein as "Current Employee Plaintiffs") is, and at all times mentioned herein was, an individual citizen of the State of Florida. Plaintiff Bane is a current employee of DISH who was informed by DISH that her Private Information was compromised in the Data Breach.

20.     Plaintiff Jada Looney ("Plaintiff Looney" and "Family Member Plaintiff") is, and at all times mentioned herein was, an individual citizen of the State of Kansas. Plaintiff Looney brings this action on behalf of her three minor children, M.L., J.L., and S.L., whose Private Information was compromised in the Data Breach.

21.     Plaintiff Rebecca Dougherty ("Plaintiff Dougherty" or "Former Employee Plaintiff") is, and at all times mentioned herein was, an individual citizen of the State of Colorado. Plaintiff Dougherty is a former employee of DISH who was informed by DISH that her Private Information was compromised in the Data Breach.

22.     Defendant DISH, a satellite television company, is a Nevada corporation with its principal place of business in Englewood, Colorado.

## JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of

interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendant DISH. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

24.     This Court has jurisdiction over the Defendant because its principal place of business is in this District, and the computer systems implicated in this Data Breach are likely based in this District.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. DISH has harmed some Class Members residing in this District.

## DISH COLLECTS HIGHLY SENSITIVE CUSTOMER AND EMPLOYEE INFORMATION

26.     DISH is a satellite television provider based in Englewood, Colorado. Founded in 1995, DISH quickly grew to be one of the biggest satellite television providers in the United States, serving nearly 10 million customers across the country. DISH employs more than 14,000 people in the United States and generates over $2 billion in annual revenue.

27.     As a condition of receiving services and/or employment, DISH requires that its customers and employees entrust it with highly sensitive personal information, not only about themselves, but in certain instances about their family members as well. In the ordinary course of receiving service from DISH or being employed by the company, customers and employees are required to provide sensitive personal and private information, such as:

- Names;

- Dates of birth;

- Addresses

6

- Email addresses

- Social Security numbers;

- Driver's license numbers and information;

- Financial account information;

- Payment card information;

- Vaccination records; and

- Health and other insurance information.

28.     DISH uses this information, *inter alia*, to provide services, collect and distribute payment, and carry out its obligations as an employer.

29.     In its privacy policy, DISH promises its customers and employees that it will not share this highly sensitive information with third parties except in specified, defined circumstances such as service providers and mailing list partners.[4]

30.     In its privacy policy, DISH touts that it "take[s] information security seriously[]" and "use[s] commercially reasonable efforts to protect information [it] collect[s] and maintain[s] against loss; misuse; and unauthorized access, disclosure, alteration, or destruction."[5]

31.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, DISH assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

---

[4] https://www.dish.com/downloads/legal/privacystatement.aspx (last visited May 26, 2023).  *See also Dish Careers* at https://careers.dish.com/about/benefits (last visited May 26, 2023) (also linking to the same privacy policy).

[5] *Id.*

32.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and that of their family members.

33.     Plaintiffs and Class Members relied on DISH to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

## DISH'S DATA BREACH

34.     Plaintiffs were customers, employees, or family members of employees of DISH. As a mandatory part of being a customer and employee, DISH collected names, addresses, Social Security numbers, financial information, vaccination status, health insurance information, and driver's license information.

35.     On or about February 25, 2023, news reports circulated that for the previous 24 hours DISH had been experiencing a "widespread outage [that] affect[ed] Dish.com, Dish Anywhere app as well as several websites and networks owned by the corporation. Customers also suggest[ed] the company's call center phone numbers are unreachable."[6]  Later reports indicated that the outages also effected Boost Mobile, which is a subsidiary of DISH.[7]

36.     According to public announcements by DISH, including a Form 8-K filed with the SEC, the company experienced a cybersecurity incident on February 23, 2023. The unauthorized

---

[6] *See* https://www.bleepingcomputer.com/news/security/dish-network-goes-offline-after-likely-cyberattack-employees-cut-off/ (last visited on May 26, 2023).

[7] *See* https://www.bleepingcomputer.com/news/security/dish-network-confirms-ransomware-attack-behind-multi-day-outage/ (last visited on May 26, 2023).

individual or individuals, believed to have been the Black Basta ransomware gang according to news reports, accessed a cache of highly sensitive PII.[8]

37.     On or about March 14, 2023, DISH confirmed to customers that the Data Breach included their personal information, adding that "[t]he forensic investigation and assessment of the impact of this incident is ongoing." It promised customers that it would let "impacted customers know" what personal information was compromised.[9]  However, as of March 22, 2023, DISH told its customers that it was still working to restore all of its "customer experiences … but it will take a little time before our systems are fully restored."[10]

38.     On or about May 15, 2023, DISH also confirmed to its current and former employees that the Data Breach included their personal information and/or personal information about their family members (presumably collected for benefits purposes), and that it was "notifying the list of persons whose personal information is confirmed to have been included[.]"

39.     DISH had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

40.     Plaintiffs and Class Members provided their Private Information to DISH with the reasonable expectation and mutual understanding that DISH would comply with its obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of security breaches.

---

[8] *See* https://www.bleepingcomputer.com/news/security/dish-network-confirms-ransomware-attack-behind-multi-day-outage/ (last visited on May 26, 2023).

[9] *See* https://www.dish.com/statement (last visited on May 26, 2023).

[10] *Id.*

41.     DISH's data security obligations were particularly important given the substantial increase in cyberattacks and ransomware attacks in particular.

42.     DISH knew or should have known that its electronic records would be targeted by cybercriminals yet failed to safeguard them.

## PLAINTIFFS' EXPERIENCES

### *Plaintiff Owen-Brooks*

43.     Plaintiff Owen-Brooks is a DISH customer.

44.     As is her normal procedure, she pays her bills at least one or two months in advance. Therefore, in February 2023 she had approximately $200 in her DISH account.

45.     However, late in that month she checked her account and discovered that the $200 that was in her account had been improperly removed from her DISH account without her consent. She thereafter called DISH's customer support.  The support representative indicated to her that DISH had been hacked, and the representative confirmed to her that her PII was part of the Data Breach

46.     Therefore, as a direct and proximate result of the Data Breach, Plaintiff Owen-Brooks spent more than an hour on the phone with DISH trying to address the theft of her funds.

47.     Plaintiff Owen-Brooks suffered actual injury in the form of time spent dealing with theft of her funds and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

48.     Plaintiff Owen-Brooks suffered actual injury in the loss of the funds in her DISH networks account and additional damages resulting from such loss of use.

49.     Plaintiff Owen-Brooks would not have kept money in her DISH account if Defendant had timely disclosed that its systems lacked adequate computer and data security practices to safeguard customers' personal and financial information from theft, and that those systems were subject to a data breach.

50.     Plaintiff Owen-Brooks suffered actual injury from having her PII compromised and/or stolen as a result of the Data Breach.

51.     Plaintiff Owen-Brooks suffered actual injury and damages in paying money to DISH that she would not have paid had Defendant disclosed that its systems lacked computer and data security practices adequate to safeguard customers' personal and financial information and had Defendant provided timely and accurate notice of the Data Breach.

52.     Plaintiff Owen-Brooks suffered actual injury in the form of damages to and diminution in the value of her personal and financial information – a form of intangible property that Plaintiff Owen-Brooks entrusted to Defendant for the purpose of receiving its services and which was compromised in, and as a result of, the Data Breach.

53.     Plaintiff Owen-Brooks suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her personal information being placed in the hands of criminals who have already misused such information stolen in the Data Breach.

54.     Plaintiff Owen-Brooks has a continuing interest in ensuring that her PII, which remains in the possession of Defendant, are protected and safeguarded from future breaches.

55.     As a result of the Data Breach, Plaintiff Owen-Brooks made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach

and reviewing financial accounts for any indications of actual or attempted identity theft or fraud;. Plaintiff Owen-Brooks has spent several hours dealing with the Data Breach, valuable time Plaintiff Owen-Brooks otherwise would have spent on other activities.

56.     As a result of the Data Breach, Plaintiff Owen-Brooks has suffered anxiety as a result of the release of her PII , which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her PII for purposes of identity crimes, fraud, and theft. Plaintiff Owen-Brooks is very concerned about identity theft, and fraud, as well as the consequences of such identity theft, and fraud resulting from the Data Breach.

57.     Plaintiff Owen-Brooks suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Defendant obtained from Plaintiff Owen-Brooks; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud.

58.     As a result of the Data Breach, Plaintiff Owen-Brooks anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Owen-Brooks is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### Plaintiff Cook

59.     Plaintiff Cook joined DISH as an employee in or around February 2021.

60.     When Plaintiff Cook joined DISH, and thereafter as an employee, Defendant required Plaintiff Cook provide it with substantial amounts of her PII and PHI.

61.     Plaintiff Cook became aware of the Data Breach at the time it occurred, but was not aware that her PII and PHI was being affected.

62.     Thereafter, on or about May 15, 2023, Plaintiff Cook received a letter entitled "Notice of Data Breach" which told her that her PII and PHI had been extracted during the Data Breach. The notice letter informed her that the PII stolen included her Social Security number, "and depending on the underlying record, may also have included a vaccination record, health insurance information, financial account number, driver's license or other government ID number, date of birth, and/or payment card number."

63.     The notice letter offered Plaintiff Cook two years of credit monitoring services if she took the additional step of signing up before August 31, 2023.  Two years of credit monitoring is not sufficient given that Plaintiff Cook will now experience a lifetime of increased risk of identity and potential medical fraud.

64.     Plaintiff Cook suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

65.     Plaintiff Cook would not have provided her PII and PHI to Defendant if Defendant had timely disclosed that its systems lacked adequate computer and data security practices to safeguard its customers' and employees' personal and financial information from theft, and that those systems were subject to a data breach.

66.     Plaintiff Cook suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach.

67.     Plaintiff Cook suffered actual injury in the form of damages to and diminution in the value of her personal, health, and financial information – a form of intangible property that Plaintiff Cook entrusted to Defendant for the purpose of working for Defendant and which was compromised in, and as a result of, the Data Breach.

68.     Plaintiff Cook suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

69.     Plaintiff Cook has a continuing interest in ensuring that her PII and PHI, which remain in the possession of Defendant, are protected and safeguarded from future breaches.

70.     As a result of the Data Breach, Plaintiff Cook made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendant. Plaintiff Cook has spent several hours dealing with the Data Breach, valuable time Plaintiff Cook otherwise would have spent on other activities.

71.     As a result of the Data Breach, Plaintiff Cook has suffered anxiety as a result of the release of her PII and PHI, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her PII and PHI for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Cook is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

72.     Plaintiff Cook also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her PII and PHI, a form of property that Defendant obtained from Plaintiff Cook; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud.

73.     As a result of the Data Breach, Plaintiff Cook anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

### *Plaintiff Dougherty*

74.     Plaintiff Dougherty was a DISH employee for almost 13 years, from roughly late 2007 through May of 2020.

75.     When Plaintiff Dougherty joined DISH, and thereafter as an employee, Defendant required Plaintiff Dougherty provide it with substantial amounts of her PII and PHI.

76.     Plaintiff Dougherty became aware of the Data Breach at the time it occurred, but was not aware that her PII and PHI was being affected.

77.     Thereafter, on or about May 15, 2023, Plaintiff Dougherty received a letter entitled "Notice of Data Breach" which told her that her PII and PHI had been extracted during the Data Breach. The notice letter informed her that the PII stolen included her Social Security number, "and depending on the underlying record, may also have included a vaccination record, health insurance information, financial account number, driver's license or other government ID number, date of birth, and/or payment card number."

15

78.     The notice letter offered Plaintiff Dougherty two years of credit monitoring services if she took the additional step of signing up before August 31, 2023. Two years of credit monitoring is not sufficient given that Plaintiff Dougherty will now experience a lifetime of increased risk of identity and potential medical fraud.

79.     Plaintiff Dougherty suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

80.     Plaintiff Dougherty would not have provided her PII and PHI to Defendant if Defendant had timely disclosed that its systems lacked adequate computer and data security practices to safeguard its customers' and employees' personal and financial information from theft, and that those systems were subject to a data breach.

81.     Plaintiff Dougherty suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach.

82.     Plaintiff Dougherty suffered actual injury in the form of damages to and diminution in the value of her personal, health, and financial information – a form of intangible property that Plaintiff Dougherty entrusted to Defendant for the purpose of working for Defendant and which was compromised in, and as a result of, the Data Breach.

83.     Plaintiff Dougherty suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

84.     Plaintiff Dougherty has a continuing interest in ensuring that her PII and PHI, which remain in the possession of Defendant, are protected and safeguarded from future breaches.

85.     As a result of the Data Breach, Plaintiff Dougherty made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendant. Plaintiff Dougherty has spent several hours dealing with the Data Breach, valuable time Plaintiff Dougherty otherwise would have spent on other activities.

86.     As a result of the Data Breach, Plaintiff Dougherty has suffered anxiety as a result of the release of her PII and PHI, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her PII and PHI for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Dougherty is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

87.     Plaintiff Dougherty also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her PII and PHI, a form of property that Defendant obtained from Plaintiff Dougherty; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud.

88.     As a result of the Data Breach, Plaintiff Dougherty anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

*Plaintiff Bane*

89.     Plaintiff Bane joined DISH as an employee in or around January 2022 and is currently employed by DISH.

90.     When Plaintiff Bane joined DISH, it required her to provide it with substantial amounts of her PII and PHI.

91.     Plaintiff Bane became aware of the Data Breach at the time it occurred, but was not aware that her Private Information was also impacted.

92.     Thereafter, on or about May 15, 2023, Plaintiff Bane received a letter entitled "Notice of Data Breach" which told her that her PII and PHI had been extracted during the Data Breach. The notice letter informed her that the PII stolen included her Social Security number, "and depending on the underlying record, may also have included a vaccination record, health insurance information, financial account number, driver's license or other government ID number, date of birth, and/or payment card number."

93.     The notice letter offered Plaintiff Bane two years of credit monitoring services if she took the additional step of signing up before August 31, 2023.  Two years of credit monitoring is not sufficient given that Plaintiff Bane will now experience a lifetime of increased risk of identity and potential medical fraud.

94.     Plaintiff Bane suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

95.     Plaintiff Bane would not have provided her PII and PHI to Defendant if Defendant had timely disclosed that its systems lacked adequate computer and data security practices to

safeguard its customers' and employees' personal and financial information from theft, and that those systems were subject to a data breach.

96.     Plaintiff Bane suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach.

97.     Plaintiff Bane suffered actual injury in the form of damages to and diminution in the value of her personal, health, and financial information – a form of intangible property that Plaintiff Bane entrusted to Defendant for the purpose of working for Defendant and which was compromised in, and as a result of, the Data Breach.

98.     Plaintiff Bane suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

99.     Plaintiff Bane has a continuing interest in ensuring that her PII and PHI, which remain in the possession of Defendant, are protected and safeguarded from future breaches.

100.    As a result of the Data Breach, Plaintiff Bane made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendant. Plaintiff Bane has spent several hours dealing with the Data Breach, valuable time Plaintiff Bane otherwise would have spent on other activities.

101.    As a result of the Data Breach, Plaintiff Bane has suffered anxiety as a result of the release of her PII and PHI, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her PII and PHI for purposes of committing cyber and other crimes against her including, but not limited to,

fraud and identity theft. Plaintiff Bane is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

102.    Plaintiff Bane also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her PII and PHI, a form of property that Defendant obtained from Plaintiff Bane; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud.

103.    As a result of the Data Breach, Plaintiff Bane anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

### Plaintiff Looney

104.    Plaintiff Looney's husband is a former employee of DISH who, as a condition of his employment, was required to provide his Private Information and that of his family members, including the Private Information belonging to his children, to DISH in order to obtain compensation and benefits from the company as its employee.

105.    On or around May 17, 2023, Plaintiff Looney's three children, M.L., J.L., and S.L., each received a letter entitled "Notice of Data Breach" which told them that their Private Information had been extracted during the Data Breach. The notice letter informed Plaintiff Looney that Private Information stolen included her children's "health insurance information and Social Security number" were impacted.

106.    Plaintiff Looney's children have suffered actual injury in the form of having their highly sensitive Private Information compromised and/or stolen as a result of the Data Breach.

107.    They have also suffered actual injury in the form of damages to and diminution in the value of their personal and health information, including their Social Security number and health insurance information – a form of intangible property that Plaintiff Looney, her husband, and her children entrusted to Defendant so that Plaintiff Looney's husband could become employed and maintain employment with Defendant and which was ultimately compromised as a result of the Data Breach.

108.    Plaintiff Looney's children have suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by their Private Information being placed in the hands of criminals, especially at such a young age.

109.    Plaintiff Looney and her children have a continuing interest in ensuring that their Private Information, which remain in the possession of Defendant, is protected and safeguarded from future breaches.

110.    As a result of the Data Breach, Plaintiff Looney's children have suffered anxiety as a result of the release of their PII and PHI, which they believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using their PII and PHI for purposes of committing cyber and other crimes against them that include, but are not limited to, fraud and identity theft. Plaintiff Looney's children are very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on their lives.

111.    Plaintiff Looney's children also suffered actual injury from having their Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of their PII and PHI, a form of property that Defendant obtained from Plaintiff Looney's husband as a condition of his employment; (b) violation of their privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud that they now face.

112.    As a result of the Data Breach, Plaintiff Looney anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach, which time and money could be spent on other activities.

### DISH FAILED TO COMPLY WITH HIPAA AND FTC GUIDELINES

113.    Title II of HIPAA contains what are known as the Administration Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling protected health information ("PHI") similar to the data Defendant left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

114.    DISH's Data Breach resulted from a combination of insufficiencies that indicate DISH failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from DISH's Data Breach that it either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiffs' and Class Members' PHI.

115.    Plaintiffs' and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by CFR § 160.103.

116.    45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

117.    45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

118.    Plaintiffs' and Class Members' Private Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

119.    Plaintiffs' and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

120.    Based upon the Notice to Plaintiffs and Class Members, DISH reasonably believes that Plaintiffs' and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

121.    Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

122.    By sending out notices, DISH reasonably believes that Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

123.    Plaintiffs' and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

124.    By sending out notices, DISH reasonably believes that Plaintiffs' and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

125.    It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

126.    After receiving notice that they were victims of the Data Breach (which required the filing of a data breach report in accordance with 45 CFR § 164.408(a)), it is reasonable for recipients of that notice, including Plaintiffs and Class Members in this case, to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm. Clearly DISH believed mitigation efforts were reasonable because it offered identity protection services to the effected Class Members.

127.    In addition, DISH's Data Breach could have been prevented if DISH had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its current and former employees.

128.    DISH's security failures also include, but are not limited to:

   a.   Failing to maintain an adequate data security system to prevent data loss;

   b.   Failing to mitigate the risks of a data breach and loss of data;

24

c.  Failing to ensure the confidentiality and integrity of electronic protected health information DISH creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f.  Failing to identify and respond to suspected or known security incidents;

g.  Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i.  Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j.  Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 CFR 164.306(a)(94); and

k.   Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

129.   The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414 also required DISH to provide notice of the Data Breach to each affected individual "without unreasonable delay and *in no case later than 60 days following discovery of the breach*" (emphasis added).

130.   Because DISH has failed to comply with HIPAA, while monetary relief may cure some of Plaintiffs' and Class Members' injuries, injunctive relief is also necessary to ensure DISH's approach to information security is adequate and appropriate going forward. DISH still maintains the PHI and other highly sensitive PII of its current and former employees, and their family members, including Plaintiffs and Class Members. Without the supervision of the Court through injunctive relief, Plaintiffs' and Class Members' Private Information remains at risk of subsequent data breaches.

131.   Moreover, the Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

132.   In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to

correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

133.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

134.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

135.    The FTC has also long warned companies about the possibility of ransomware attacks in particular, providing *inter alia* specific guidance to companies regarding how to avoid such attacks, and going so far as to provide a "Ransomware Quiz" for companies to use to identify ransomware.[11]

---

[11]*See* https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/ransomware; https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/quiz/ransomware; https://www.ftc.gov/business-guidance/blog/2020/12/ransomware-prevention-update-businesses (last visited on May 26, 2023).

136.     On information and belief, DISH failed to properly implement basic data security practices. DISH's failure to employ reasonable and appropriate measures to protect against unauthorized access to customer and employee PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

137.     DISH was at all times fully aware of its obligation to protect the PII of its current and former customers and employees and their families.

## DISH FAILED TO COMPLY WITH INDUSTRY STANDARDS

138.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

139.     Like the FTC, law enforcement and industry leaders have long warned of the dangers regarding ransomware attacks.  In 2021 alone, the FBI's Internet Crime Complaint Center received 3,729 complaints regarding ransomware attacks. "Those attacks accounted for financial losses of $49.2 million."[12]  However, that number may be too small because according to the U.S. Treasury's Financial Crimes Enforcement Network analysis, in 2021 there were $1.2 billion in Bank Secrecy Act filings for ransomware-related incidents, up from just $416 million in similar filings in 2020.[13]

140.     Among other things, security experts have noticed an increase in recent years of so-called *double extortion*: "In the past, ransomware was about attackers encrypting information

---

[12] *See* https://www.techtarget.com/searchsecurity/feature/Ransomware-trends-statistics-and-facts (last visited on May 26, 2023).

[13] *See* https://www.techtarget.com/searchsecurity/feature/Ransomware-trends-statistics-and-facts (last visited on May 26, 2023).

found on a system and then demanding a ransom in exchange for a decryption key. With double extortion, attackers also exfiltrate the data to a separate location. There, it can be used for other purposes, including leaking the information to a public website if a payment is not received."[14]

141.    According to news reports, double extortion is what happened to DISH.

142.    Several best practices have been identified that, at a minimum, should be implemented by businesses like DISH, including but not limited to: educating employees; implementing strong passwords, multi-layer security (including firewalls, anti-virus, and anti-malware software), encryption, and multi-factor authentication; making data unreadable without a key; backing up data; and limiting which employees can access sensitive data.

143.    Various experts have provided numerous recommendations regarding how to prevent double extortion ransomware attacks.  These include "preventive data encryption and preventive data deception" among other things.[15]

144.    Upon information and belief, Defendant failed to follow some or all of these industry best practices.

145.    Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

---

[14] *Id.*

[15] *See* http://people.se.cmich.edu/liao1q/papers/ransomwareportfolio.pdf (last visited on May 26, 2023).

146.    Upon information and belief, Defendant failed to meet the minimum standards of any of the following frameworks, thereby opening the door to the cyber incident and causing the Data Breach: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

## DISH'S DATA SECURITY OBLIGATIONS

147.    DISH breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and the highly sensitive data stored thereon. DISH's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    Failing to adequately protect customers', employees', and the employees' family members' Private Information;

c.    Failing to properly monitor its own data security systems for existing intrusions;

d.    Failing to fully comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTCA;

e.    Failing to fully comply with HIPAA guidelines for storage of electronic records containing PHI; and

f.    Failing to adhere to industry standards for cybersecurity.

148.     As the result of computer systems in need of security upgrading, inadequate procedures for handling emails containing viruses or other malignant computer code, and employees who opened files containing the virus or malignant code that perpetrated the cyberattack, DISH negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

149.     Accordingly, as outlined below, Plaintiffs' and Class Members' daily lives were severely disrupted. What's more, they have experienced fraud and identity theft and/or will now face an increased risk of fraud and identity theft. Plaintiffs and Class Members also lost the benefit of the bargain they made with DISH.

## DATA BREACHES, FRAUD, AND IDENTITY THEFT

150.     The FTC hosted a workshop to discuss "informational injuries" which are injuries that consumers suffer from privacy and security incidents, such as data breaches or unauthorized disclosure of data.[16] Exposure of personal information that a consumer wishes to keep private, may cause both market and non-market harm to the consumer, such as the ability to obtain or keep employment. Consumers loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

151.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or take over victims' identities in order to engage in illegal financial transactions

---

[16] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf. (last visited May 8, 2023).

under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

152.    In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

153.    Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

154.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent

charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[17]

155.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

156.    Identity thieves can also use Social Security numbers and driver's license numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

157.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of PII:[18]



---

[17] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited May 8, 2023).

[18] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www. creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited May 8, 2023).

158.   Moreover, theft of Private Information is also gravely serious. Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond doubt that Private Information has considerable market value.

159.   It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[19]

160.   Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

161.   There is a strong probability that entire batches of the stolen Private Information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

---

[19] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited May 8, 2023).

## PLAINTIFFS' AND CLASS MEMBERS' DAMAGES

162.     Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

163.     Plaintiffs' Private Information, including sensitive PII and, in the case of DISH's employees' and their families, sensitive PHI, was compromised as a direct and proximate result of the Data Breach.

164.     As a direct and proximate result of DISH's conduct, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

165.     As a direct and proximate result of DISH's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

166.     Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, tax return fraud, medical identity theft, utility bills opened in their names, credit card fraud, and similar identity theft.

167.     An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[20] In fact, the data marketplace is so sophisticated that consumers can sell their non-public information directly to a data broker who in turn aggregates the information and provides it to other companies.[21] For example, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[22]

---

[20] *See* Data Coup, https://datacoup.com/ (last visited on May 26, 2023).
[21] *What is digi.me?, DIGI.ME,* https://digi.me/what-is-digime/ (last visited May 26, 2023).
[22] *Frequently Asked Questions,* Nielsen Computer & Mobile Panel,
https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited May 26, 2023).

168.     As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiffs and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiffs and the Class Members, thereby causing additional loss of value.

169.     Plaintiffs and Class Members also face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to target such schemes more effectively to Plaintiffs and Class Members.

170.     Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

171.     Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff Owen-Brooks and other similarly situated current or former customers of DISH overpaid for a service that was intended to be accompanied by adequate data security but was not, because part of the price they paid to DISH was intended to be used by DISH to fund adequate security of DISH's computer property and protect its customers' Private Information. Likewise, current and former employees of DISH entrusted their valuable Private Information, and that of their family members, to DISH as part of qualifying for employment and receiving compensation

and benefits in exchange for providing their labor. This exchange was reasonably expected to have included adequate data security storage practices employed by DISH, but did not. Thus, Plaintiffs and the Class Members did not get what they bargained for.

172.    As a direct and proximate result of DISH's conduct, Plaintiffs and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

173.    Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims have suffered or will suffer ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach both on themselves and for some employees, on their family members, relating to:

      a.  Finding fraudulent charges;

      b.  Canceling and reissuing credit and debit cards;

      c.  Purchasing credit monitoring and identity theft prevention;

      d.  Addressing their inability to withdraw funds linked to compromised accounts;

      e.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

      f.  Placing "freezes" and "alerts" with credit reporting agencies;

g. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h. Contacting financial institutions and closing or modifying financial accounts;

i. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j. Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

174. Indeed, as previously noted, Plaintiff Owen-Brooks' DISH account was zeroed out after the Data Breach when she previously had over $200 in that account. This is consistent with news reports stating that DISH's payment systems were compromised by the attack.

175. Moreover, Plaintiffs and Class Members have an interest in ensuring that their and their family members' Private Information, which is believed to still be in the possession of DISH, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

176.    As a direct and proximate result of DISH's actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and either have suffered harm or are at an imminent and increased risk of future harm.

**CLASS ALLEGATIONS**

177.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and on behalf of all other persons similarly situated.

178.    Customer Plaintiff proposes the following class and subclass definitions, subject to amendment as appropriate:

### Nationwide Customer Class

All current and former DISH customers in the United States whose Private Information was impacted by the Data Breach, including all who were sent a notice of the Data Breach.

### North Carolina Subclass

All current and former DISH customers residing in North Carolina whose Private Information was impacted by the Data Breach, including all who were sent a notice of the Data Breach.

179.    Current Employee Plaintiffs propose the following class definition subject to amendment as appropriate:

### Nationwide Current Employee Class

All current DISH employees in the United States whose Private Information was impacted by the Data Breach, including all who were sent a notice of the Data Breach.

180.    Former Employee Plaintiff proposes the following class definition subject to amendment as appropriate:

### Nationwide Former Employee Class

> All former DISH employees in the United States whose Private Information was impacted by the Data Breach, including all who were sent a notice of the Data Breach.

181.   Family Member Plaintiff proposes the following class definition, subject to amendment as appropriate:

### Nationwide Family and Minor Class

> All family members, including children, of current and former DISH employees in the United States whose Private Information was impacted by the Data Breach, including all who were sent, or whose parents were sent, a notice of the Data Breach.

182.   The foregoing classes are referred to herein each as a "Class," and collectively as the "Classes," and all members of the Classes are referred to as "Class Members".

183.   Excluded from each of the Classes are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded are any Judge to whom this case is assigned as well as his or her judicial staff and immediate family members.

184.   Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

185.   Each of the proposed Classes meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

186.   <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Nationwide Customer Class consists of nearly 10 million customers of DISH and the Nationwide Current Employee Class, the Nationwide Former Employee Class, and the Nationwide Family and Minor Class collectively include roughly 300,000

current and former employees and their family members whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through DISH's records, Class Members' records, self-identification, and other means.

187.    <u>Commonality</u>. There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.   Whether DISH engaged in the conduct alleged herein;

b.   Whether DISH's conduct violated the FTCA and/or HIPAA;

c.   When DISH first learned of the Data Breach and whether its response was adequate;

d.   Whether DISH unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

e.   Whether DISH failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

f.   Whether DISH's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g.   Whether DISH's data security systems prior to and during the Data Breach were consistent with industry standards;

h.   Whether DISH owed a duty to Class Members to safeguard their Private Information;

i.   Whether DISH breached its duty to Class Members to safeguard their Private Information;

j.   Whether computer hackers obtained Class Members' Private Information in the Data Breach;

k.   Whether DISH had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

l.   Whether DISH breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

m.   Whether DISH knew or should have known that its data security systems and monitoring processes were deficient;

n.   What damages Plaintiffs and Class Members suffered as a result of DISH's misconduct;

o.   Whether DISH's conduct was negligent;

p.   Whether DISH's conduct was *per se* negligent;

q.   Whether DISH was unjustly enriched;

r.   Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

s.   Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and are entitled to other monetary relief; and

t.   Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

188.    Typicality. The claims of each of the Plaintiffs, or groups of Plaintiffs identified above are typical of those of other Class Members in their respective Classes because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

189.    Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs' Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

190.    Predominance. DISH has engaged in a common course of conduct toward Plaintiffs and Class Members in that, on information and belief, all of Plaintiffs' and Class Members' data was stored on the same computer system or systems and unlawfully accessed in the same way. The common issues arising from DISH's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

191.    Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for DISH. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

192.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). DISH has acted or has refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

193.     Finally, all members of the proposed Class are readily ascertainable. DISH has access, or will have access to, the names and addresses of Class Members affected by the Data Breach.

## CLAIMS FOR RELIEF

## COUNT I
## NEGLIGENCE
## (ON BEHALF OF PLAINTIFFS AND THE CLASSES)

194.     Plaintiffs restate and reallege the allegations in paragraphs 1-193 as if fully set forth herein.

195.     DISH knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

196.     DISH's duty included a responsibility to implement processes by which it could detect and analyze a breach of its security systems in an expeditious period of time and to give prompt notice to those affected in the case of a cyberattack.

197.     DISH knew, or should have known, of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security. DISH was on notice because on information and belief it knew or should have known that a television

provider that serves millions and employs hundreds of thousands of people is an attractive target for cyberattacks due to the high volume of sensitive data it stores.

198.     DISH owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to it. DISH's duties included, but were not limited to, the following:

    a.   To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting. and protecting Private Information in its possession;

    b.   To protect PII and in some instance PHI using reasonable and adequate security procedures and systems that are compliant with the industry standards;

    c.   To have procedures in place to prevent the loss or unauthorized dissemination of PII and in some instance PHI in its possession;

    d.   To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to the North Carolina Deceptive Trade Practices Act;

    e.   To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

    f.   To promptly notify Plaintiffs and the Class Members of a data breach and to disclose the types of information compromised.

199.     DISH's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant was bound by industry standards to protect confidential Private Information.

200.    Plaintiffs and the Class Members were foreseeable and probable victims of any inadequate security practices and DISH owed them a duty of care not to subject them to an unreasonable risk of harm.

201.    DISH, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within DISH's possession.

202.    DISH, by its actions and/or omissions, breached its duty of care by failing to provide, or by acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

203.    DISH, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then provide prompt notice of the Data Breach to those whose Private Information was compromised.

204.    DISH breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

    b.  Failing to adequately monitor the security of its networks and systems;

    c.  Failure to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards; and

    d.  Allowing unauthorized access to Class Members' Private Information.

205.    DISH had a special relationship with Plaintiffs and the Class Members. Plaintiffs' and Class Members' willingness to entrust DISH with their Private Information was predicated on the understanding that DISH would take adequate security precautions. The members of the Current Employee Class, Former Employee Class, and Family and Minor Class also had a special relationship with Defendants by virtue of their current or former employment relationship. Moreover, only DISH had the ability to protect its systems (and the Private Information that it stored on them) from attack.

206.    DISH's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised.

207.    As a result of DISH's ongoing failure to notify Plaintiffs and Class Members regarding exactly what Private Information has been compromised, Plaintiffs and Class Members are unable to take all the necessary precautions to mitigate damages by preventing future fraud.

208.    DISH's breaches of duty caused a foreseeable risk of harm to Plaintiffs and Class Members to suffer from identity theft, loss of time and money to monitor their finances for fraud, and loss of control over their Private Information.

209.    As a result of DISH's negligence and breach of duties which led to the Private Information of Plaintiffs and Class Members falling into the hands of cybercriminals, Plaintiffs and Class Members have suffered and/or are at a substantial and imminent risk of suffering from the misuse of their Private Information for fraudulent purposes.

210.    DISH also had independent duties under state and federal laws and regulations that required it to reasonably safeguard Plaintiffs' and the Class Members' Private Information and

promptly notify them about the Data Breach. DISH's failure to observe the FTCA and HIPAA are evidence of its negligent failure to safeguard Plaintiffs' and Class Members' Private Information.

211.    As a direct and proximate result of DISH's negligent conduct, Plaintiffs and the Class Members have suffered damages and are at imminent risk of further harm.

212.    The injury and harm that Plaintiffs and the Class Members suffered was reasonably foreseeable and was the direct and proximate result of DISH's negligent conduct.

213.    Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

214.    In addition to monetary relief, Plaintiffs and the Class Members also are entitled to injunctive relief requiring DISH to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and the Class.

**COUNT II**
**NEGLIGENCE *PER SE***
**(ON BEHALF OF PLAINTIFFS AND THE CLASSES)**

215.    Plaintiffs restate and reallege the allegations in paragraphs 1-214 as if fully set forth herein.

216.    Pursuant to HIPAA and Section 5 of the FTCA, DISH had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information, including PII and PHI, of Plaintiffs and Class Members.

217.    Upon information and belief, DISH breached its duties by failing to employ industry standard data and cybersecurity measures to gain compliance with those laws, including,

but not limited to, proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

218.    Plaintiffs and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect.

219.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect Private Information. The FTC publications described above, and the industry standard data and cybersecurity measures, also form part of the basis of DISH's duty in this regard.

220.    Pursuant to HIPAA, Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' PHI.

221.    Under HIPAA, Defendant had a duty to render electronic PHI into unusable, unreadable, or indecipherable form. *See* 45 C.F.R. § 164.304.

222.    DISH violated the FTCA and HIPAA by failing to use reasonable measures to protect Private Information of Plaintiffs and Class Members and by not complying with applicable industry standards, as described herein.

223.    It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to DISH's networks, databases, and computers that stored or contained Plaintiffs' and Class Members' Private Information.

224.    DISH's violations of the FTCA and HIPAA constitute negligence *per se*.

225.    Plaintiffs' and Class Members' Private Information constitutes personal property that was stolen due to DISH's negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

226.    As a direct and proximate result of DISH's negligence *per se*, Plaintiffs and the Class have suffered and continue to suffer injuries and damages arising from the unauthorized access of their Private Information (including PII and PHI) because of the Data Breach, including but not limited to, damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives and the lives of their family members.

227.    DISH breached its duties to Plaintiffs and the Class Members under these laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

228.    As a direct and proximate result of DISH's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

229.    In addition to monetary relief, Plaintiffs and Class Members also are entitled to injunctive relief requiring DISH to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and the Class Members.

## COUNT III
## BREACH OF CONTRACT
## (ON BEHALF OF PLAINTIFFS AND THE CLASSES)

230.    Plaintiffs restate and reallege the allegations in paragraphs 1-229 as if fully set forth herein.

231. Plaintiffs and Class Members entered into a valid and enforceable contract when they paid money to DISH in exchange for services and/or became employed by DISH, which included promises to secure, safeguard, protect, keep private, and not disclose Plaintiffs' and Class Members' Private Information.

232. DISH's Privacy Policy memorialized the rights and obligations of DISH and its customers and employees. This document was provided to Plaintiffs and Class Members in a manner and during a time when it became part of the agreement for services and/or employment.

233. In the Privacy Policy, DISH commits to using commercially reasonable efforts to protect the privacy and security of personal information against unauthorized access and it promises to only share the Private Information with third parties in specified circumstances.

234. Plaintiffs and Class Members fully performed their obligations under their contracts with DISH.

235. DISH did not secure, safeguard, protect, or keep private Plaintiffs' and Class Members' PII and PHI and instead allowed it to be disclosed to third parties. Therefore, DISH breached its contracts with Plaintiffs and Class Members.

236. DISH allowed third parties to access, copy, and/or transfer Plaintiffs' and Class Members' Private Information without Plaintiffs' and Class Members' consent and, therefore, DISH breached the Privacy Policy with Plaintiffs and Class Members.

237. DISH's failure to satisfy its confidentiality and privacy obligations resulted in DISH providing services to Plaintiffs and Class Members that were of a diminished value.

238. As a result, Plaintiffs and Class Members have been harmed, damaged, and/or injured as described herein.

239.    In addition to monetary relief, Plaintiffs and Class Members are entitled to injunctive relief requiring DISH to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASSES)**

240.    Plaintiffs restate and reallege the allegations in paragraphs 1-239 as if fully set forth herein.

241.    This Count is pleaded in the alternative to Count III above.

242.    Plaintiffs and Class Members formed an implied contract with DISH for its services and/or employment through the parties' collective conduct, which included but was not limited to, Plaintiffs and Class Members either paying for goods, labor, and services, and/or becoming employed and working for DISH, while also entrusting DISH with their highly sensitive Private Information.

243.    Through DISH's performance of, and/or sale of labor and goods and services to the Consumer Class, or through its hiring and employment of the Employee Class, it knew or should have known that it must protect Plaintiffs' and Class Members' confidential Private Information in accordance with DISH's policies, practices, and applicable law.

244.    As consideration, Plaintiffs and Class Members paid money to DISH for its services, labor and goods and/or turned over their valuable Private Information to Defendant as a condition of employment. Accordingly, Plaintiffs and Class Members bargained with DISH to securely maintain and store their Private Information.

245.    DISH accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to them and/or employing them.

246.    In delivering their Private Information to Defendant, Plaintiffs and Class Members intended and understood that DISH would adequately safeguard the Private Information as part of that service.

247.    Defendant's implied promises to Plaintiffs and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; (7) complying with HIPAA standards to make sure that Plaintiffs' and Class Members' Private Information would remain protected; and (8) taking other steps to protect against foreseeable data breaches.

248.    Plaintiffs and Class Members would not have entrusted their Private Information to DISH in the absence of such an implied contract.

249.    Had DISH disclosed to Plaintiffs and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and Class Members would not have provided their Private Information to DISH.

250.     DISH recognized (or should have recognized) that Plaintiffs' and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and the other Class Members.

251.     DISH violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class Members' Private Information. DISH further breached these implied contracts by failing to comply with its promise to abide by HIPAA.

252.     DISH violated these contracts by failing to employ reasonable and adequate data security measures to secure Plaintiffs' and Class Members' Private Information and by disclosing it for purposes not required or permitted under the contracts or agreements.

253.     Plaintiffs and Class Members have been damaged by DISH's conduct, including by paying for data and cybersecurity protection that they did not receive, entrusting DISH with valuable Private Information, and by incurring the harms and injuries arising from the Data Breach now and in the future.

## COUNT V
## VIOLATION OF NORTH CAROLINA DECEPTIVE TRADE PRACTICES ACT
### (ON BEHALF OF PLAINTIFF OWEN-BROOKS
### AND THE NORTH CAROLINA SUBCLASS)

254.     Plaintiff Owen-Brooks restates and realleges the allegations in paragraphs 1-253 as if fully set forth herein.

255.     As fully alleged above, DISH engaged in unfair and deceptive acts and practices in violation of the North Carolina Deceptive Trade Practices Act, N.C. Gen. Stat. §75-1.1.

256.     North Carolina law declares unlawful all "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1.

257.   "Commerce" is defined broadly as any business activity other than "professional services rendered by a members of a learned profession." *Id.*

258.   DISH's sale of satellite television services constitutes commerce under North Carolina law.

259.   DISH engaged in unlawful, unfair, and deceptive acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the services purchased by Plaintiff Owen-Brooks and the North Carolina Subclass in violation of N.C. Gen. Stat. § 75-1.1, including but not limited to the following:

    a.   DISH misrepresented material facts by representing that, in connection with its provision of services, it would maintain adequate data privacy and security practices and procedures to safeguard the Private Information from unauthorized disclosure, release, data breach, and theft;

    b.   DISH omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for the North Carolina Subclass's Private Information;

    c.   DISH engaged in unfair, unlawful, and deceptive acts and practices as part of its provision of commercial services by failing to maintain the privacy and security of the North Carolina Subclass's Private Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, including the FTCA, resulting in the Data Breach; and

      d.   DISH engaged in unlawful, unfair, and deceptive acts and practices with respect to its provision of services by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect the North Carolina Subclass's Private Information from further unauthorized disclosure, release, data breach, and theft.

260.    The above unlawful, unfair, and deceptive acts and practices on the part of DISH were immoral, unethical, oppressive, and unscrupulous. These acts and practices caused substantial injury or will cause substantial injury to individuals that they could not reasonably avoid. This substantial injury outweighs any benefits to consumers.

261.    DISH knew, or should have known, that its computer systems and data security practices were inadequate to safeguard the North Carolina Subclass's Private Information and that risk of a data breach or theft was highly likely. DISH's actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of the North Carolina Subclass.

262.    As a direct and proximate result of DISH's deceptive acts and practices, Plaintiff Owen-Brooks and members of the North Carolina Subclass suffered an ascertainable loss, including the loss of their legally protected interest in the confidentiality and privacy of their Private Information.

263.    Individuals injured by unfair or deceptive acts or practices are entitled to treble damages. N.C. Gen. Stat. § 75-16. Thus, Plaintiff Owen-Brooks and the North Carolina Subclass seek and request treble damages, attorney fees, expenses, and costs, and injunctive relief pursuant to N.C. Gen. Stat. §75-1.1, *et seq.*

**COUNT VI**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASSES)**

264.     Plaintiffs restate and reallege the allegations in paragraphs 1-263 as if fully set forth herein.

265.     This Count is pleaded in the alternative to Counts III and IV above.

266.     Plaintiff Owen-Brooks and the Customer Class Members conferred a benefit on DISH by paying for products and services that should have included data and cybersecurity protection to protect their Private Information. DISH did not provide such protection and Plaintiff Owen-Brooks and Customer Class Members did not receive such protection.

267.     Plaintiffs Cook, Bane, Looney, and Dougherty and the Members of the Current Employee Class, the Former Employee Class, and the Family and Minor Class all conferred a benefit on DISH by entrusting it with their valuable and highly sensitive Private Information in exchange for employment and/or other benefits that include, but are not limited to, the implementation of adequate data security practices, procedures, and protocols that would be sufficient to protect such Private Information from unauthorized disclosure.

268.     DISH has retained the benefits of its unlawful conduct, including by retaining Plaintiffs' and Class Members' valuable Private Information, retaining the services of the Members of the Current Employee Class and Former Employee Class, and the amounts received for data and cybersecurity practices that it did not provide. Due to DISH's conduct alleged herein, it would be unjust and inequitable under the circumstances for DISH to be permitted to retain the benefit of its wrongful conduct.

269.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from DISH, and/or an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by DISH from its wrongful conduct. If necessary, the establishment of a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation may be created.

**COUNT VII**
**DECLARATORY JUDGMENT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASSES)**

270.    Plaintiffs restate and reallege the allegations in paragraphs 1-269 as if fully set forth herein.

271.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

272.    DISH owes a duty of care to Plaintiffs and Class Members which required it to adequately secure their Private Information.

273.    DISH still possesses Plaintiffs' and Class Members' Private Information.

274.    Plaintiffs allege that DISH's data security measures remain inadequate. Furthermore, Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

275.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.  DISH owes a legal duty to secure current and former customers' and employees' (and their families') Private Information and to timely notify individuals of a data breach under the common law, HIPAA, and Section 5 of the FTCA;

b.  DISH's existing data security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to protect individuals' Private Information; and

c.  DISH continues to breach this legal duty by failing to employ reasonable measures to secure individuals' Private Information.

276.  This Court also should issue corresponding prospective injunctive relief requiring DISH to employ adequate security protocols consistent with legal and industry standards to protect current and former customers' and employees' (and their families') Private Information, including the following:

a.  Order DISH to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members; and

b.  Order DISH to comply with its explicit or implicit contractual obligations and duties of care by implementing and maintaining reasonable data security measures, including, but not limited to:

i.  engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on DISH's systems, on a periodic basis, and ordering DISH to promptly correct any problems or issues detected by such third-party security auditors;

ii.       engaging third-party security auditors and internal personnel to run automated security monitoring;

iii.     auditing, testing, and training its security personnel regarding any new or modified procedures;

iv.     segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised hackers cannot gain access to other portions of DISH's systems;

v.      conducting regular database scanning and securing checks;

vi.     routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii.    meaningfully educating its current and former users and employees about the threats they face resulting from the loss of their Private Information to third parties, as well as the steps they must take to protect themselves.

277.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury and will lack an adequate legal remedy to prevent further injury in the event of another data breach at DISH. The risk of another such breach is real, immediate, and substantial. If another breach at DISH occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

278.    The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to DISH if an injunction is issued. Plaintiffs and Class Members will likely be subjected to substantial identity theft and other related damages. On the other hand, the cost of

DISH's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and DISH has a preexisting legal obligation to employ such measures.

279.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at DISH, thus preventing the additional future injury to Plaintiffs and Class Members whose Private Information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes described above, seeks the following relief:

a.  An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Classes as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Classes requested herein;

b.  Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.  An order providing injunctive and other equitable relief as necessary to protect the interests of Plaintiffs and Class Members as requested herein;

d.  An order instructing DISH to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e.  An order requiring DISH to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.   A judgment in favor of Plaintiffs and the Class awarding them pre-judgment and

post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable

by law, and

g.   An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.

DATED:  May 26, 2023.                     Respectfully submitted,


By: */s/ Mark E. Saliman*
Mark E. Saliman
**SALIMAN LAW, LLC**
3900 E. Mexico Ave., Suite 300
Denver, CO 80210
Tel: (720) 907-7652
E: mark@salimanlaw.com

Mason A. Barney (*admission to be requested*)
Tyler J. Bean (*admission to be requested*)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: mbarney@sirillp.com
E: scohen@sirillp.com

***Counsel for Plaintiffs and the Proposed Class***