**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:23-CV-01168-RMR-SP

*In RE: Dish Network Data Security Incident Ligitation*

---

**CONSOLIDATED CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

---

Plaintiffs Susan Owen-Brooks, Suzanne Cook, Crystal Bane, Rebecca Dougherty, David Abraham, Michael Cardenas, Daniel Clark, John Cruse, Laina Jenkins, Kimberly Sandretto, Christie Turley, and Laura Vest, individually and on behalf of all similarly situated persons, and Jada Looney on behalf of herself and her three minor children, M.L., J.L., and S.L., and all similarly situated persons (collectively, "Plaintiffs"), allege the following against DISH Network Corporation and DISH Network LLC (collectively, "DISH" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, *inter alia*, the investigation of counsel and review of public documents as to all other matters:

**<u>INTRODUCTION</u>**

1.     With this action, Plaintiffs seek to hold DISH responsible for the harms it caused and will continue to cause Plaintiffs and hundreds of thousands of other similarly situated persons—e.g., DISH current and former customers, employees, those employees' family members—in the preventable cyberattack purportedly discovered by Defendant in February 2023, by which cybercriminals infiltrated Defendant's inadequately protected network and accessed highly sensitive information which was being kept unprotected (the "Data Breach").

4862-5027-4961

1

2.    DISH, based in Englewood, Colorado, is a satellite television company that serves nearly 10 million customers across the nation. According to news reports, "this widespread outage hit Dish.com, the Dish Anywhere app, Boost Mobile (a subsidiary owned by Dish Wireless), and other websites and networks owned and operated by Dish Network."[1]

3.    In a Form 8-K filed with the Securities and Exchange Commission, on or about February 28, 2023, the company admitted to experiencing, "a network outage that affected internal servers and IT telephony," and that the company "became aware that certain data was extracted from the Corporation's IT systems as part of this incident[,]" which possibly "includes Private Information."[2]

4.    On or about March 14, 2023, DISH started emailing customers, notifying them of a hacking incident in which data including Private Information was compromised.

5.    This first series of emails confirmed that, on February 23, 2023, DISH experienced a cybersecurity incident. Therein, DISH informed its customers that, on February 27, 2023, it "became aware that certain data was extracted from our IT systems as part of this incident" (the "Data Breach"). In response, DISH allegedly launched an investigation, which is ongoing.

---

[1] *See* https://www.bleepingcomputer.com/news/security/dish-network-confirms-ransomware-attack-behind-multi-day-outage/ (last visited on Sept. 15, 2023).

[2] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001001082/000155837023002254/dish-20230223x8k.htm (last visited on Sept. 15, 2023).

4862-5027-4961                                    2

6.      In furtherance of DISH's notification process, on or about May 15, 2023, Defendant sent letters to its current and former employees providing them with basic facts regarding the Data Breach and the resulting compromise of their (and their family members') highly sensitive Private Information.

7.      According to news reports, the incident was a "ransomware attack on the Corporation's employees, customers, business, operations or financial results" carried out by a Russian ransomware gang by the name of "Black Basta."[3]

8.      Upon information and belief, the information compromised in the Data Breach included highly sensitive data that represents a gold mine for a ransomware gang like Black Basta, including Class Members' (as defined below) names, dates of birth, physical and email addresses, Social Security numbers, driver's license or state identification card numbers, credit card or account information, vaccination records, health insurance information and financial account numbers (collectively, "Private Information") that DISH collected and maintained.

9.      Armed with the Private Information accessed in the Data Breach, and a head start, data thieves can and likely will commit a variety of crimes against Plaintiffs and Class Members including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's

---

[3]  *See*  https://www.bleepingcomputer.com/news/security/dish-network-confirms-ransomware-attack-behind-multi-day-outage/ (last visited on Sept. 15, 2023).

licenses in Class Members' names but with another person's photograph, and giving false information to police during arrests.

10.    The potential for improper disclosure of Plaintiffs' and Class Members' Private Information in the potential nefarious uses that information were risks known to DISH. Thus, DISH was on notice that failing to take steps necessary to secure the Private Information and avoid those risks could have dire consequences, and yet it failed to properly monitor the computer network and systems that housed the Private Information. Had DISH properly monitored its networks, it could have prevented the Data Breach.

11.    Plaintiffs' and Class Members' identities, including the identities of minors, are now at risk because of DISH's negligent conduct insofar as the Private Information DISH collected and maintained is now in the hands of cybercriminals and/or other unauthorized third parties.

12.    Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

13.    Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to DISH's data security systems, future annual audits, and the provision of adequate credit monitoring services funded by DISH.

**PARTIES**

14.    Plaintiff Susan Owen-Brooks ("Plaintiff Owen-Brooks") is, and at all times mentioned herein was, an individual citizen of the State of North Carolina. Plaintiff Owen-

4862-5027-4961                                                    4

Brooks is a customer of DISH who was informed by DISH that her information was compromised in the Data Breach.

15.    Plaintiff Suzanne Cook ("Plaintiff Cook) is, and at all times mentioned herein was, an individual citizen of the State of Florida. Plaintiff Cook is a current employee of DISH who was informed by DISH that her Private Information was compromised in the Data Breach.

16.    Plaintiff Crystal Bane ("Plaintiff Bane" and, with Plaintiff Cook, also referred to herein as "Current Employee Plaintiffs") is, and at all times mentioned herein was, an individual citizen of the State of Florida. Plaintiff Bane is a current employee of DISH who was informed by DISH that her Private Information was compromised in the Data Breach.

17.    Plaintiff Jada Looney ("Plaintiff Looney" and "Family Member Plaintiff") is, and at all times mentioned herein was, an individual citizen of the State of Kansas. Plaintiff Looney brings this action on behalf of herself and her three minor children, M.L., J.L., and S.L., whose Private Information was compromised in the Data Breach.

18.    Plaintiff Rebecca Dougherty ("Plaintiff Dougherty") is, and at all times mentioned herein was, an individual citizen of the State of Colorado. Plaintiff Dougherty is a former employee of DISH who was informed by DISH that her Private Information was compromised in the Data Breach.

19.    Plaintiff David Abraham ("Plaintiff Abraham" and, with Plaintiff Dougherty, also referred to herein as "Former Employee Plaintiffs") is, and at all times mentioned herein was, an individual citizen of the State of Wyoming. Plaintiff Abraham is a former

4862-5027-4961                              5

employee of DISH who was informed by DISH that his Private Information was compromised in the Data Breach.

20.    Plaintiff Michael Cardenas ("Plaintiff Cardenas" and, with Plaintiffs Bane and Cook, also referred to herein as "Current Employee Plaintiffs") is, and at all times mentioned herein was, an individual citizen of the State of Tennessee. Plaintiff Cardenas is a current employee of DISH who was informed by DISH that his Private Information was compromised in the Data Breach.

21.    Plaintiff Daniel Clark ("Plaintiff Clark" and, with Plaintiffs Dougherty and Abraham, also referred to herein as "Former Employee Plaintiffs") is, and at all times mentioned herein was, an individual citizen of the State of Colorado. Plaintiff Clark is a former employee of DISH who was informed by DISH that his Private Information was compromised in the Data Breach.

22.    Plaintiff John Cruse ("Plaintiff Cruse" and, with Plaintiffs Dougherty, Abraham and Clark, also referred to herein as "Former Employee Plaintiffs") is, and at all times mentioned herein was, an individual citizen of the State of Tennessee. Plaintiff Cruse is a former employee of DISH who was informed by DISH that his Private Information was compromised in the Data Breach.

23.    Plaintiff Laina Jenkins ("Plaintiff Jenkins" and, with Plaintiffs Dougherty, Abraham, Clark, and Cruse, also referred to herein as "Former Employee Plaintiffs") is, and at all times mentioned herein was, an individual citizen of the State of West Virginia. Plaintiff Jenkins is a former employee of DISH who was informed by DISH that her Private Information was compromised in the Data Breach.

4862-5027-4961

6

24.    Plaintiff Kimberley Sandretto ("Plaintiff Sandretto" and, with Plaintiff Owen-Brooks, "Customer Plaintiffs") is, and at all times mentioned herein was, an individual citizen of the State of Wisconsin. Plaintiff Sandretto is a customer of DISH who was informed by DISH that her information was compromised in the Data Breach.

25.    Plaintiff Christie Turley ("Plaintiff Turley" and, with Plaintiffs Dougherty, Abraham, Clark, Cruse, and Jenkins, also referred to herein as "Former Employee Plaintiffs") is, and at all times mentioned herein was, an individual citizen of the State of Illinois. Plaintiff Jenkins is a former employee of DISH who was informed by DISH that her Private Information was compromised in the Data Breach.

26.    Plaintiff Laura Vest ("Plaintiff Vest" and, with Plaintiffs Owen-Brooks and Sandretto, "Customer Plaintiffs") is, and at all times mentioned herein was, an individual citizen of the State of Virginia. Plaintiff Vest is a customer of DISH who was informed by DISH that her information was compromised in the Data Breach.

27.    Defendant DISH, a satellite television company, is a Nevada corporation with its principal place of business in Englewood, Colorado.

## JURISDICTION AND VENUE

28.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendant DISH. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

4862-5027-4961

29.    This Court has jurisdiction over the Defendant because its principal place of business is in this District, and the computer systems implicated in this Data Breach are likely based in this District.

30.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. DISH has harmed some Class Members residing in this District.

## ALLEGATIONS

### A. DISH COLLECTS HIGHLY SENSITIVE CUSTOMER AND EMPLOYEE INFORMATION

31.    DISH is a satellite television provider based in Englewood, Colorado. Founded in 1995, DISH quickly grew to be one of the biggest satellite television providers in the United States, serving nearly 10 million customers across the country. DISH employs more than 14,000 people in the United States and generates over $2 billion in annual revenue.

32.    As a condition of receiving services and/or employment, DISH requires that its customers and employees entrust it with highly sensitive Private Information, not only about themselves, but in certain instances about their family members as well. In the ordinary course of receiving service from DISH and/or being employed by the company, customers and employees are required to provide sensitive personal and private information, such as: Names; Dates of birth; Addresses; Email addresses; Social Security numbers; Driver's license numbers and information; Financial account information; Payment card information; Vaccination records; and Health and other insurance information.

4862-5027-4961

8

33.     DISH uses these types of information, *inter alia*, to provide services, collect and distribute payment, and carry out its obligations as an employer.

34.     In its privacy policy, DISH promises its customers and employees that it will not share this highly sensitive information with third parties except in specified, defined circumstances such as service providers and mailing list partners.[4]

35.     In its privacy policy, DISH further touts that it "take[s] information security seriously[]" and "use[s] commercially reasonable efforts to protect information [it] collect[s] and maintain[s] against loss; misuse; and unauthorized access, disclosure, alteration, or destruction."[5]

36.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, DISH assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

37.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and that of their family members.

38.     Plaintiffs and Class Members relied on DISH to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

---

[4]     https://www.dish.com/downloads/legal/privacystatement.aspx (last visited Sept. 15, 2023). *See also Dish Careers* at https://careers.dish.com/about/benefits (last visited Sept. 15, 2023) (also linking to the same privacy policy).

[5]     *Id.*

## B. DISH'S DATA BREACH

39.     Plaintiffs were customers, employees, or family members of employees of DISH. As a mandatory part of being a customer and employee, DISH collected, *inter alia*, names, addresses, Social Security numbers, financial information, vaccination status, health insurance information, and driver's license information.

40.     On or about February 25, 2023, news reports circulated that, for the previous 24 hours DISH had been experiencing a "widespread outage [that] affect[ed] Dish.com, Dish Anywhere app as well as several websites and networks owned by the corporation. Customers also suggest[ed] the company's call center phone numbers are unreachable."[6] Later reports indicated that the outages also effected Boost Mobile, which is a subsidiary of DISH.[7]

41.     According to public announcements by DISH, including a Form 8-K filed with the U.S. Securities and Exchange Commission, DISH experienced a cybersecurity incident, starting on February 23, 2023. The unauthorized individual or individuals, announced by news reports to have been the Black Basta ransomware gang, accessed a cache of highly sensitive PII.[8]

---

[6] *See* https://www.bleepingcomputer.com/news/security/dish-network-goes-offline-after-likely-cyberattack-employees-cut-off/ (last visited on Sept. 15, 2023).

[7] *See* https://www.bleepingcomputer.com/news/security/dish-network-confirms-ransomware-attack-behind-multi-day-outage/ (last visited on Sept. 15, 2023).

[8] *See* https://www.bleepingcomputer.com/news/security/dish-network-confirms-ransomware-attack-behind-multi-day-outage/ (last visited on Sept. 15, 2023).

42.     On or about March 14, 2023, DISH confirmed to its customers that the Data Breach included their Private Information, adding that "[t]he forensic investigation and assessment of the impact of this incident is ongoing." It promised customers that it would let "impacted customers know" what Private Information was compromised.[9] However, as of March 22, 2023, DISH told its customers that it was still working to restore all of its "customer experiences … but it will take a little time before our systems are fully restored."[10]

43.     On or about May 15, 2023, DISH also confirmed to its current and former employees that the Data Breach included their Private Information and/or Private Information about their family members (presumably collected for benefits purposes), and that it was "notifying the list of persons whose Private Information is confirmed to have been included[.]"

44.     DISH had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

45.     Plaintiffs and Class Members provided their Private Information to DISH with the reasonable expectation and mutual understanding that DISH would comply with its obligations to keep such information confidential and secure from unauthorized access

---

[9] *See* https://www.dish.com/statement (last visited on Sept. 15, 2023).

[10] *Id.*

and to provide timely notice of security breaches. DISH knew and/or should have known that Plaintiffs and Class Members maintained this expectation.

## C. PLAINTIFFS' EXPERIENCES

### *Plaintiff Owen-Brooks*

46.     Plaintiff Owen-Brooks is a resident and citizen of the State of North Carolina and a current customer of DISH.

47.     Plaintiff Owen-Brooks received a notice from DISH concerning the Data Breach. The notice stated that unauthorized actors "extracted" certain data from its IT systems as part of the Data Breach. As a result, Plaintiff Owen-Brooks has faced, and will continue to face, a substantial and imminent risk of fraud and identity theft.

48.     Specifically, Plaintiff Owen-Brooks was the victim of fraudulent charges made to her personal DISH account. As is her normal procedure, she pays her bills at least one or two months in advance. Therefore, in February 2023 she had approximately $200 in her DISH account. However, in late February, she checked her account and discovered that the $200 that was in her account had been improperly removed without her consent. She thereafter called DISH's customer support. The support representative indicated to her that DISH had been hacked, and the representative confirmed to her that her personal information was part of the Data Breach. Therefore, as a direct and proximate result of the Data Breach, Plaintiff Owen-Brooks spent more than an hour on the phone with DISH trying to address the theft of her funds.

49.     Plaintiff Owen-Brooks has spent approximately ten (10) hours addressing the Data Breach, including spending approximately one (1) hour on the phone with the

4862-5027-4961

12

DISH support representative attempting to address the theft of her funds. She has also spent time monitoring her credit and other accounts.

50.     Plaintiff Owen-Brooks would not have kept money in her DISH account or paid for DISH services if Defendant had timely disclosed that its systems lacked adequate computer and data security practices to safeguard customers' personal and financial information from theft, and that those systems were subject to a data breach.

### Plaintiff Cook

51.     Plaintiff Cook is a resident and citizen of the State of Florida.

52.     Plaintiff Cook has been an employee of DISH since 2021 and, as a result, her personal information was impacted by the Data Breach.

53.     Plaintiff Cook received a notice from DISH concerning the Data Breach that stated that unauthorized actors "extracted" certain data from its IT systems as part of the Data Breach. According to the notice, the compromised files contained Plaintiff Cook's name, payment card information, financial account number, health insurance information, medical information, COVID-19 vaccination status, and Social Security number. Plaintiff Cook has faced, and will continue to face, a substantial and imminent risk of fraud and identity theft.

54.     Dealing with the consequences of the Data Breach has become a daily chore for Plaintiff Cook, who has received an uptick in spam calls, emails and/or text messages since the Data Breach. Plaintiff Cook has spent approximately eight (8) hours addressing the Data Breach, including spending time placing freezes on her credit with each of the three credit bureaus, and monitoring her accounts and credit report.

4862-5027-4961                                    13

55.     Additionally, Plaintiff Cook experiences anxiety and a feeling of helplessness as a result of the Data Breach and is fearful she will be the victim of identity theft.

### *Plaintiff Dougherty*

56.     Plaintiff Dougherty is a resident and citizen of the State of Colorado.

57.     Plaintiff Dougherty is a former employee of DISH, and her husband is a current employee. She and her family have received benefits from DISH by virtue of her (and her husband's) employment. As a result, her husband and daughter were also impacted by the Data Breach.

58.     Plaintiff Dougherty, her husband, and her daughter each received a notice from DISH concerning the Data Breach stating that unauthorized actors "extracted" certain data from its IT systems as part of the Data Breach. According to the notice, the compromised files contained Plaintiff Dougherty's name, payment card information, financial account number, health insurance information, medical information, COVID-19 vaccination status and Social Security number. Plaintiff Dougherty has faced, and will thus continue to face, a substantial and imminent risk of fraud and identity theft.

59.     Plaintiff Dougherty has spent time monitoring her accounts and credit report(s) and placing freezes on those accounts. Her and her husband's stock in the company also decreased significantly following the Data Breach and DISH's failure to respond to and adequately ameliorate the harmful and widespread impact thereof.

4862-5027-4961                                              14

60. Additionally, Plaintiff Dougherty experiences anxiety and a feeling of helplessness as a result of the Data Breach and is fearful she will be the victim of identity theft.

### *Plaintiff Bane*

61. Plaintiff Bane is a resident and citizen of the State of Florida.

62. Plaintiff Bane is a current employee of DISH and has been employed by DISH since February 2021. She and her family members receive benefits from DISH by virtue of her employment. As a result, her husband and minor son were also impacted by the Data Breach.

63. Plaintiff Bane and her family members each received a notice from DISH concerning the Data Breach. The notice stated that unauthorized actors "extracted" certain data from its IT systems as part of the Data Breach. According to the notice, the compromised files contained Plaintiff Bane's name, payment card information, financial account number, health insurance information, medical information, COVID-19 vaccination status, and Social Security number. Plaintiff Bane has faced, and will continue to face, a substantial and imminent risk of fraud and identity theft.

64. Dealing with the consequences of the Data Breach has become a daily chore for Plaintiff Bane, who receives multiple spam calls, emails, and/or texts each day. Plaintiff Bane has spent approximately sixty (60) to eighty (80) hours addressing the Data Breach, including spending time monitoring her accounts and credit report, speaking with representatives at her bank regarding the Data Breach, transferring funds from one account to another, and updating her credit cards.

65.     Additionally, Plaintiff Bane now experiences anxiety and a feeling of helplessness as a result of the Data Breach and is fearful she will be the victim of identity theft. Plaintiff Bane has also lost sleep because of the stress and anxiety arising from knowing her information is now in the hands of cybercriminals. Further, the physical symptoms of anxiety that she has experienced, including panic attacks, required medical intervention and care.

### *Plaintiff Abraham*

66.     Plaintiff David Abraham is a resident and citizen of the State of Wyoming.

67.     Plaintiff Abraham is a former employee of DISH. Plaintiff Abraham was employed by DISH from 2010 to 2013, and again from 2015-2022, and he and his family received benefits from DISH by virtue of his employment. As a result, his children and his wife were also impacted by the Data Breach.

68.     Plaintiff Abraham received a notice from DISH concerning the Data Breach. The notice stated that unauthorized actors "extracted" certain data from its IT systems as part of the Data Breach. According to the notice, the compromised files contained Plaintiff Abraham's name, payment card information, financial account number, health insurance information, medical information, COVID-19 vaccination status, and Social Security number. Plaintiff Abraham has faced, and will continue to face, a substantial and imminent risk of fraud and identity theft.

69.     Dealing with the consequences of the Data Breach has become a daily chore for Plaintiff Abraham. Plaintiff Abraham has spent approximately sixteen (16) hours addressing the Data Breach, including multiple hours making phone calls, reviewing, and

4862-5027-4961

16

sending emails, and monitoring his accounts and credit report as a result of the Data Breach.

70.     Additionally, Plaintiff Abraham experiences anxiety and a feeling of helplessness as a result of the Data Breach and is fearful he, his wife, and his children will be the victims of identity theft. He is also fearful of the repercussions that the Data Breach will have on his family's financial wellbeing in the future.

### Plaintiff Cardenas

71.     Plaintiff Michael B. Cardenas is a resident and citizen of the State of Tennessee.

72.     Plaintiff Cardenas is a current employee of DISH. Plaintiff Cardenas was employed by DISH from April 2018 to March 2020, and again from April 2022 to current day, and received benefits from DISH by virtue of his employment.

73.     Plaintiff Cardenas received a notice from DISH concerning the Data Breach. The notice stated that unauthorized actors "extracted" certain data from its IT systems as part of the Data Breach. According to the notice, the compromised files contained Plaintiff Cardenas's name, payment card information, financial account number, health insurance information, medical information, COVID-19 vaccination status, and Social Security number. Plaintiff Cardenas has faced, and will continue to face, a substantial and imminent risk of fraud and identity theft.

74.     Specifically, Plaintiff Cardenas was the victim of fraud when he began receiving letters from various lending institutions claiming that unknown individuals had been applying for car loans using his name and information. Plaintiff Cardenas also

4862-5027-4961                                    17

suffered fraud when his bank notified him that an unknown individual charged $125.00 to his debit card in another state in or around August 2023.

75.    Dealing with the consequences of the Data Breach has become a daily chore for Plaintiff Cardenas. Plaintiff Cardenas has spent approximately three hours addressing the Data Breach, including spending approximately two hours driving to and from his bank, and working with his bank, to handle the debit card fraud he experienced and monitoring his accounts and credit report.

76.    Additionally, Plaintiff Cardenas experiences anxiety and a feeling of helplessness as a result of the Data Breach and is fearful he will be the victim of identity theft again.

### Plaintiff Clark

77.    Plaintiff Daniel Clark is a resident and citizen of the State of Colorado.

78.    Plaintiff Clark is a former employee of DISH. Plaintiff Clark was employed by DISH from February 2019 to March 2021 and he and his family received benefits from DISH by virtue of his employment.

79.    Plaintiff Clark received a notice from DISH concerning the Data Breach. The notice stated that unauthorized actors "extracted" certain data from its IT systems as part of the Data Breach. According to the notice, the compromised files contained Plaintiff Clark's name, payment card information, financial account number, health insurance information, medical information, COVID-19 vaccination status, and Social Security number. Plaintiff Clark has faced, and will continue to face, a substantial and imminent risk of fraud and identity theft.

4862-5027-4961

18

80.     Specifically, Plaintiff Clark was the victim of fraud when an unknown individual tried to obtain unemployment benefits using his name in or around June 2023, and when an unknown individual tried to purchase items using his credit card. Furthermore, Plaintiff Clark was notified by his password manager that his personal information was found on the dark web.

81.     Dealing with the consequences of the Data Breach has become a daily chore for Plaintiff Clark, who receives multiple spam emails and text messages. Plaintiff Clark has spent a few hours each month addressing the Data Breach, including spending many hours monitoring his accounts and credit report.

82.     Additionally, Plaintiff Clark experiences anxiety and a feeling of helplessness as a result of the Data Breach and is fearful he will be the victim of identity theft again. Plaintiff Clark also experiences chronic migraines and lack of sleep as a result of the anxiety caused by the Data Breach.

**Plaintiff Cruse**

83.     Plaintiff John Cruse is a resident and citizen of the State of Tennessee.

84.     Plaintiff Cruse is a former employee of DISH. Plaintiff Cruse was employed by DISH from 2021 to 2023 and he and his family received benefits from DISH by virtue of his employment. As a result, his children were also impacted by the Data Breach.

85.     Plaintiff Cruse received a notice from DISH concerning the Data Breach. The notice stated that unauthorized actors "extracted" certain data from its IT systems as part of the Data Breach. According to the notice, the compromised files contained Plaintiff Cruse's name, payment card information, financial account number, health insurance

4862-5027-4961

information, medical information, COVID-19 vaccination status, and Social Security number. Plaintiff Cruse has faced, and will continue to face, a substantial and imminent risk of fraud and identity theft.

86.    Specifically, Plaintiff Cruse denied a new job during a security clearance check because his information was found on the dark web.

87.    Dealing with the consequences of the Data Breach has become a daily chore for Plaintiff Cruse, who receives approximately four (4) spam calls each day, along with spam emails and text messages. Plaintiff Cruse has spent approximately eighty (80) hours addressing the Data Breach, including spending many hours researching the Data Breach, discussing the Data Breach with his supervisors, driving to and from his bank to fix issues concerning the Data Breach, and monitoring his accounts and credit report.

88.    Additionally, Plaintiff Cruse experiences anxiety and a feeling of helplessness as a result of the Data Breach and is fearful he will be the victim of identity theft. As a result of the Data Breach, Plaintiff Cruse has suffered many sleepless nights, fears of ruined credit, not being able to purchase a house or car, and being worried about the impact of the Data Breach on his children.

### *Plaintiff Jenkins*

89.    Plaintiff Jenkins is a resident and citizen of the State of West Virginia.

90.    Plaintiff Jenkins is a former employee of DISH. Plaintiff Jenkins was employed by DISH in or around 2019.

91.    Plaintiff Jenkins received a notice from DISH concerning the Data Breach. The notice stated that unauthorized actors "extracted" certain data from its IT systems as

4862-5027-4961

20

part of the Data Breach. According to the notice, the compromised files contained Plaintiff Jenkins's name, payment card information, financial account number, health insurance information, medical information, COVID-19 vaccination status, and Social Security number. Plaintiff Jenkins has faced, and will continue to face, a substantial and imminent risk of fraud and identity theft.

92.    Plaintiff Jenkins has been the victim of multiple instances of fraud as a result of the Data Breach. Specifically, Ms. Jenkins suffered an unknown individual attempting to sign up for an investment account at a company named "M1" using her information, an unknown individual attempting to open an account at a bank called "Aspire" using her information and suffered nine (9) credit inquiries on her credit report for lines of credit that she never opened. Furthermore, Plaintiff Jenkins discovered through Experian that her Social Security number, email, phone number, and address were found on the dark web.

93.    Dealing with the consequences of the Data Breach has become a daily chore for Plaintiff Jenkins, who receives multiple spam calls along with spam emails and text messages. Plaintiff Jenkins has spent approximately ten (10) hours addressing the Data Breach, including spending many of those hours contacting Transunion, sending emails, and monitoring her accounts and credit report.

94.    Additionally, Plaintiff Jenkins experiences anxiety and a feeling of helplessness as a result of the Data Breach and is fearful she will be the victim of identity theft again.

**Plaintiff Sandretto**

4862-5027-4961

95.     Plaintiff Kimberly Sandretto is a resident and citizen of the State of Wisconsin.

96.     Plaintiff Sandretto is a current customer of DISH. Plaintiff Sandretto has been a customer of DISH since 2003.

97.     Plaintiff Sandretto received a notice from DISH concerning the Data Breach. The notice stated that unauthorized actors "extracted" certain data from its IT systems as part of the Data Breach. Plaintiff Sandretto has faced, and will continue to face, a substantial and imminent risk of fraud and identity theft.

98.     Dealing with the consequences of the Data Breach has become a daily chore for Plaintiff Sandretto, who receives spam calls, spam emails, spam text messages and suspicious mail from Dish. Plaintiff Sandretto has spent considerable time addressing the Data Breach, including having to take time to reset her autopay after her online account became inaccessible and her account's auto-pay feature unilaterally disabled. She has also spent time monitoring her accounts and credit report and placing fraud alerts on her payment cards.

99.     Additionally, Plaintiff Sandretto experiences anxiety and a feeling of helplessness as a result of the Data Breach and is fearful she will be the victim of identity theft.

### Plaintiff Turley

100.    Plaintiff Turley is a resident and citizen of the State of Illinois.

101.    Plaintiff Turley was a DISH employee from January 2022 to May 2022.

4862-5027-4961                                    22

102.    Plaintiff Turley received a notice from DISH concerning the Data Breach. The notice stated that unauthorized actors "extracted" certain data from its IT systems as part of the Data Breach. According to the notice, the compromised files contained Plaintiff Turley's name, payment card information, financial account number, health insurance information, medical information, COVID-19 vaccination status, and Social Security number. Plaintiff Turley has faced, and will continue to face, a substantial and imminent risk of fraud and identity theft.

103.    Specifically, Plaintiff Turley has received notifications from two credit monitoring sites stating that her personal information is present for sale on the dark web.

104.    Dealing with the consequences of the Data Breach has become a daily chore for Plaintiff Turley, who receives multiple spam and phishing calls each day alerting her to compromises of her credit card and preapproval for loans she did not apply for. Plaintiff Turley has spent approximately five (5) hours addressing the Data Breach, including spending time sorting through the above-referenced phishing correspondence and monitoring her accounts and credit report.

105.    Additionally, Plaintiff Turley experiences anxiety and a feeling of helplessness as a result of the Data Breach and is fearful she will be the victim of identity theft again.

**Plaintiff Vest**

106.    Plaintiff Vest is a resident and citizen of the State of Virginia.

4862-5027-4961                                   23

107.    Plaintiff Vest was a customer of DISH from the year 2021 to 2022 and is also a former employee of DISH, having been employed with DISH roughly twenty (20) years ago.

108.    Plaintiff Vest received a notice from DISH concerning the Data Breach. The notice stated that unauthorized actors "extracted" certain data from its IT systems as part of the Data Breach. According to the notice, the compromised files contained Plaintiff Vest's name, payment card information, financial account number, health insurance information, medical information, COVID-19 vaccination status, and Social Security number. Plaintiff Vest has faced, and will continue to face, a substantial and imminent risk of fraud and identity theft.

109.    Specifically, Plaintiff Vest has noticed three hard inquiries on her credit report that she did not authorize, each having taken place soon after the Data Breach. Specifically, the inquiries occurred in April, June, and July 2023. Plaintiff Vest also witnessed $50 transferred from her PayPal account without her authorization and was recently notified through her credit monitoring account that her personal information is now for sale on the dark web.

110.    Dealing with the consequences of the Data Breach has become a daily chore for Plaintiff Vest, who receives numerous spam calls each day, along with spam emails and text messages. Plaintiff Vest has spent approximately fifteen (15) hours addressing the Data Breach, including spending time changing her phone's settings to attempt to reduce the spam communications she is receiving, and monitoring her accounts and credit report.

4862-5027-4961

24

111.    Additionally, Plaintiff Vest has experienced an increased daily anxiety and feelings of helplessness as a result of the Data Breach and is fearful she will be the victim of identity theft. Plaintiff Vest continues to visit her therapist and clinician related to the anxiety she is feeling.

### *Plaintiff Looney*

112.    Plaintiff Looney is a resident and citizen of the State of Kansas.

113.    Plaintiff Looney's husband is a former DISH employee, having been employed by DISH from 2019 through early 2023. She, along with her husband and her three minor children, M.L., J.L., and S.L., received benefits from DISH by virtue of her husband's employment. As a result, she and her children also received notice letters informing them that their information had been compromised as a result of the Data Breach.

114.    Specifically, the notice stated that unauthorized actors "extracted" certain data from its IT systems as part of the Data Breach. According to the notice, the compromised files contained Plaintiff Looney's and her three minor children's names, payment card information, financial account number, health insurance information, medical information, COVID-19 vaccination status, and/or Social Security number. Plaintiff Looney and her children have faced, and will continue to face, a substantial and imminent risk of fraud and identity theft.

115.    For example, Plaintiff Looney recently noticed hard inquiries on her and her husband's credit report, which they did not authorize.

4862-5027-4961                                        25

116. Dealing with the consequences of the Data Breach has become a daily chore for Plaintiff Looney, who receives multiple spam calls, emails, and texts a day, has spent approximately six (6) hours addressing the Data Breach, including time spent sorting through these spam and phishing communication and monitoring her accounts and credit report.

117. Additionally, Plaintiff Looney experiences anxiety and a feeling of helplessness as a result of the Data Breach and is fearful that she and/or her children will become victims of identity theft.

### D. DISH FAILED TO COMPLY WITH HIPAA AND FTC GUIDELINES

118. Title II of HIPAA contains what are known as the Administration Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling protected health information ("PHI") similar to the data Defendant left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

119. DISH's Data Breach resulted from a combination of insufficiencies that reveal DISH failed to comply with safeguards mandated by HIPAA regulations and industry standards. Indeed, it can be inferred from DISH's Data Breach that it either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiffs' and Class Members' PHI.

120. Plaintiffs' and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by CFR § 160.103.

4862-5027-4961

121.    45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

122.    45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

123.    Plaintiffs' and Class Members' Private Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

124.    Plaintiffs' and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

125.    Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

126.    Indeed, by sending out notices, DISH also reasonably believes that Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

127.   Plaintiffs' and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

128.   By sending out notices, DISH reasonably believes that Plaintiffs' and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

129.   There exists a rebuttable presumption that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

130.   After receiving notice that they were victims of the Data Breach (which required the filing of a data breach report in accordance with 45 CFR § 164.408(a)), it is reasonable for recipients of that notice, including Plaintiffs and Class Members, to believe that future harm (including medical identity theft) was (and remains) real and imminent, and to take steps necessary to mitigate that risk of future harm. Clearly, DISH believed mitigation efforts were reasonable because it offered identity protection services to the effected Class Members.

131.   In addition, the Data Breach could have been prevented if DISH had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its current and former employees.

132.   DISH's security failures also include, but are not limited to:

a. Failing to maintain an adequate data security system to prevent data loss;

b. Failing to mitigate the risks of a data breach and loss of data;

c. Failing to ensure the confidentiality and integrity of electronic protected health information DISH creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f. Failing to identify and respond to suspected or known security incidents;

g. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i. Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 CFR 164.306(a)(94); and

k. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

133. The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414 also required DISH to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***." (emphasis added).

134. Because DISH has failed to comply with HIPAA, while monetary relief may cure some of Plaintiffs' and Class Members' injuries, injunctive relief is also necessary to ensure DISH's approach to information security is adequate and appropriate going forward. DISH still maintains the PHI and other highly sensitive PII of its current and former employees, and their family members, including Plaintiffs and Class Members. Without the supervision of the Court through injunctive relief, Plaintiffs' and Class Members' Private Information remains at risk of subsequent data breaches.

135. Moreover, the Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

136. In October 2016, the FTC updated its publication, *Protecting Private Information: A Guide for Business*, which established cyber-security guidelines for

businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of Private Information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

137.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

138.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

139.    The FTC has also long warned companies about the possibility of ransomware attacks in particular, providing *inter alia,* specific guidance to companies

4862-5027-4961

31

regarding how to avoid such attacks, and going so far as to provide a "Ransomware Quiz" for companies to use to identify ransomware.[11]

140. On information and belief, DISH failed to properly implement basic data security practices. DISH's failure to employ reasonable and appropriate measures to protect against unauthorized access to customer and employee PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

141. DISH was, at all times, fully aware of its obligation to protect the PII of its current and former customers and employees and their families.

**E. DISH FAILED TO COMPLY WITH INDUSTRY STANDARDS**

142. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

143. Like the FTC, law enforcement and industry leaders have long warned of the dangers regarding ransomware attacks. In 2021 alone, the FBI's Internet Crime Complaint Center received 3,729 complaints regarding ransomware attacks. "Those attacks accounted for financial losses of $49.2 million."[12] However, that number may be too small because according to the U.S. Treasury's Financial Crimes Enforcement

---

[11]*See*        https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/ransomware; https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/quiz/ransomware; https://www.ftc.gov/business-guidance/blog/2020/12/ransomware-prevention-update-businesses (last visited on Sept. 15, 2023).

[12] *See* https://www.techtarget.com/searchsecurity/feature/Ransomware-trends-statistics-and-facts (last visited on Sept. 15, 2023).

Network analysis, in 2021 there were $1.2 billion in Bank Secrecy Act filings for ransomware-related incidents, up from just $416 million in similar filings in 2020.[13]

144.    Among other things, security experts have noticed an increase in recent years of so-called *double extortion*: "In the past, ransomware was about attackers encrypting information found on a system and then demanding a ransom in exchange for a decryption key. With double extortion, attackers also exfiltrate the data to a separate location. There, it can be used for other purposes, including leaking the information to a public website if a payment is not received."[14]

145.    According to news reports, double extortion is what happened to DISH.

146.    Several best practices have been identified that, at a minimum, should be implemented by businesses like DISH, including but not limited to: educating employees; implementing strong passwords, multi-layer security (including firewalls, anti-virus, and anti-malware software), encryption, and multi-factor authentication; making data unreadable without a key; backing up data; and limiting which employees can access sensitive data.

---

[13] *See* https://www.techtarget.com/searchsecurity/feature/Ransomware-trends-statistics-and-facts (last visited on Sept. 15, 2023).

[14] *Id.*

4862-5027-4961                                    33

147.   Various experts have provided numerous recommendations regarding how to prevent double extortion ransomware attacks. These include "preventive data encryption and preventive data deception" among other things.[15]

148.   Upon information and belief, Defendant failed to follow some or all of these industry best practices.

149.   Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

150.   Upon information and belief, Defendant failed to meet the minimum standards of any of the following frameworks, thereby opening the door to the cyber incident and causing the Data Breach: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

---

[15]  *See* http://people.se.cmich.edu/liao1q/papers/ransomwareportfolio.pdf (last visited on Sept. 15, 2023).

## F. DISH'S DATA SECURITY OBLIGATIONS

151.    DISH breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and the highly sensitive data stored thereon. DISH's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

   a.  Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

   b.  Failing to adequately protect customers', employees', and the employees' family members' Private Information;

   c.  Failing to properly monitor its own data security systems for existing intrusions;

   d.  Failing to fully comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTCA;

   e.  Failing to fully comply with HIPAA guidelines for storage of electronic records containing PHI; and

   f.  Failing to adhere to industry standards for cybersecurity.

152.    As the result of computer systems in need of security upgrading, inadequate procedures for handling emails containing viruses or other malignant computer code, and employees who opened files containing the virus or malignant code that perpetrated the cyberattack, DISH negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

4862-5027-4961

35

153.    Accordingly, as outlined below, Plaintiffs' and Class Members' daily lives were severely disrupted. What's more, they have experienced fraud and identity theft and/or will now face an increased risk of fraud and identity theft. Plaintiffs and Class Members also lost the benefit of the bargain they made with DISH.

### G.  DATA BREACHES, FRAUD, AND IDENTITY THEFT

154.    The FTC hosted a workshop to discuss "informational injuries" which are injuries that consumers suffer from privacy and security incidents, such as data breaches or unauthorized disclosure of data.[16] Exposure of Private Information that a consumer wishes to keep private, may cause both market and non-market harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

155.    Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's

---

[16]    *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/

reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_

injury_workshop_staff_report_-_oct_2018_0.pdf. (last visited Sept. 15, 2023).

identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or Private Information through means such as spam phone calls and text messages or phishing emails.

156.    In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

157.    Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

158.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of

the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[17]

159.    Identity thieves use stolen Private Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

160.    Identity thieves can also use Social Security numbers and driver's license numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's Private Information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

161.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of PII.[18]

---

[17]    *See    IdentityTheft.gov,*    Federal    Trade    Commission,    *available    at* https://www.identitytheft.gov/Steps (last visited May 8, 2023).

[18] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available    at*    https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited Sept. 15 2023).

162.    Moreover, theft of Private Information is also gravely serious. Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond doubt that Private Information has considerable market value.

163.    It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may



continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm." [19]

164.    Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years. There is a strong probability that entire batches of the stolen Private Information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

## H.  PLAINTIFFS' AND CLASS MEMBERS' DAMAGES

165.    Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

166.    Plaintiffs' Private Information, including sensitive PII and, in the case of DISH's employees' and their families, sensitive PHI, was compromised as a direct and proximate result of the Data Breach.

167.    As a direct and proximate result of DISH's conduct, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

---

[19] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited May 8, 2023).

168.    As a direct and proximate result of DISH's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

169.    Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, tax return fraud, medical identity theft, utility bills opened in their names, credit card fraud, and similar identity theft.

170.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[20] In fact, the data marketplace is so sophisticated that consumers can sell their non-public information directly to a data broker who in turn aggregates the information and provides it to other companies.[21] For example, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[22]

171.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been

---

[20] *See* Data Coup, https://datacoup.com/ (last visited on Sept. 15, 2023).

[21] *What is digi.me?, DIGI.ME,* https://digi.me/what-is-digime/ (last visited Sept. 15, 2023).

[22]    *Frequently Asked Questions,* Nielsen Computer & Mobile Panel,
https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Sept. 15, 2023).

destroyed because it is no longer only held by Plaintiffs and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiffs and the Class Members, thereby causing additional loss of value.

172.    Plaintiffs and Class Members also face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to target such schemes more effectively to Plaintiffs and Class Members.

173.    Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

174.    Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff Owen-Brooks and other similarly situated current or former customers of DISH overpaid for a service that was intended to be accompanied by adequate data security but was not, because part of the price they paid to DISH was intended to be used by DISH to fund adequate security of DISH's computer property and protect its customers' Private Information. Likewise, current and former employees of DISH entrusted their valuable Private Information, and that of their family members, to DISH as part of qualifying for employment and receiving compensation and benefits in exchange for providing their labor. This exchange was reasonably expected to have included adequate data security storage practices employed by DISH but did not. Thus, Plaintiffs and the Class Members did not get what they bargained for.

4862-5027-4961                                    42

175.    As a direct and proximate result of DISH's conduct, Plaintiffs and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

176.    Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims have suffered or will suffer ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach both on themselves and for some employees, on their family members, relating to:

    a.  Finding fraudulent charges;

    b.  Canceling and reissuing credit and debit cards;

    c.  Purchasing credit monitoring and identity theft prevention;

    d.  Addressing their inability to withdraw funds linked to compromised accounts;

    e.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

    f.  Placing "freezes" and "alerts" with credit reporting agencies;

    g.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

    h.  Contacting financial institutions and closing or modifying financial accounts;

    i.   Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

    j.   Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

    k.   Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

177. Indeed, as previously noted, Plaintiff Owen-Brooks' DISH account was zeroed out after the Data Breach when she previously had over $200 in that account. This is consistent with news reports stating that DISH's payment systems were compromised by the attack.

178. Moreover, Plaintiffs and Class Members have an interest in ensuring that their and their family members' Private Information, which is believed to still be in the possession of DISH, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

179. As a direct and proximate result of DISH's actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and either have suffered harm or are at an imminent and increased risk of future harm.

4862-5027-4961

## CLASS ALLEGATIONS

180.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and on behalf of all other persons similarly situated.

181.    Customer Plaintiffs propose the following class and subclass definitions, subject to amendment as appropriate:

### Nationwide Customer Class
All current and former DISH customers in the United States whose Private Information was accessed in the Data Breach announced by DISH starting on or about March 2023, including all current and former DISH customers who were sent a notice of the Data Breach.

### North Carolina Subclass
All current and former DISH customers residing in North Carolina whose Private Information was accessed in the Data Breach announced by DISH starting on or about March 2023, including all who were sent a notice of the Data Breach.

### Virginia Subclass
All current and former DISH customers residing in Virginia whose Private Information was accessed in the Data Breach announced by DISH starting on or about March 2023, including all who were sent a notice of the Data Breach.

### Wisconsin Subclass
All current and former DISH customers residing in Wisconsin whose Private Information was accessed in the Data Breach announced by DISH starting on or about March 2023, including all who were sent a notice of the Data Breach.

182.    Current Employee Plaintiffs propose the following class definition subject to amendment as appropriate:

### Nationwide Current Employee Class
All current DISH employees in the United States whose Private Information was accessed in the Data Breach announced by DISH starting on or about March 2023, including all who were sent a notice of the Data Breach.

4862-5027-4961                                      45

183. Former Employee Plaintiffs propose the following class definition subject to amendment as appropriate:

**Nationwide Former Employee Class**
All former DISH employees in the United States whose Private Information was accessed in the Data Breach announced by DISH starting on or about March 2023, including all who were sent a notice of the Data Breach.

184. Family Member Plaintiff proposes the following class definition, subject to amendment as appropriate:

**Nationwide Family and Minor Class**
All family members, including children, of current and former DISH employees in the United States whose Private Information was accessed in the Data Breach announced by DISH starting on or about March 2023, including all who were sent, or whose parents were sent, a notice of the Data Breach.

185. The foregoing classes are referred to herein each as a "Class," and collectively as the "Classes," and all members of the Classes are referred to as "Class Members."

186. Excluded from each of the Classes are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded are any Judge to whom this case is assigned as well as his or her judicial staff and immediate family members.

187. Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

188. Each of the proposed Classes meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

4862-5027-4961

46

189.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Nationwide Customer Class consists of nearly 10 million customers of DISH and the Nationwide Current Employee Class, the Nationwide Former Employee Class, and the Nationwide Family and Minor Class collectively include roughly 300,000 current and former employees and their family members whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through DISH's records, Class Members' records, self-identification, and other means.

190.    <u>Commonality</u>. There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

      a.   Whether DISH engaged in the conduct alleged herein;

      b.   Whether DISH's conduct violated the FTCA and/or HIPAA;

      c.   When DISH first learned of the Data Breach and whether its response was adequate;

      d.   Whether DISH unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

      e.   Whether DISH failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

4862-5027-4961

47

f.  Whether DISH's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g.  Whether DISH's data security systems prior to and during the Data Breach were consistent with industry standards;

h.  Whether DISH owed a duty to Class Members to safeguard their Private Information;

i.  Whether DISH breached its duty to Class Members to safeguard their Private Information;

j.  Whether computer hackers obtained Class Members' Private Information in the Data Breach;

k.  Whether DISH had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

l.  Whether DISH breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

m.  Whether DISH knew or should have known that its data security systems and monitoring processes were deficient;

n.  What damages Plaintiffs and Class Members suffered as a result of DISH's misconduct;

o.  Whether DISH's conduct was negligent;

p.  Whether DISH's conduct was *per se* negligent;

q.  Whether DISH was unjustly enriched;

r.   Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

s.   Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and are entitled to other monetary relief; and

t.   Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

191.   <u>Typicality</u>. The claims of each of the Plaintiffs, or groups of Plaintiffs identified above are typical of those of other Class Members in their respective Classes because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

192.   <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs' Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

193.   <u>Predominance</u>. DISH has engaged in a common course of conduct toward Plaintiffs and Class Members in that, on information and belief, all of Plaintiffs' and Class Members' data was stored on the same computer system or systems and unlawfully accessed in the same way. The common issues arising from DISH's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

194.    Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for DISH. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

195.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). DISH has acted or has refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

196.    Finally, all members of the proposed Class are readily ascertainable. DISH has access, or will have access to, the names and addresses of Class Members affected by the Data Breach.

4862-5027-4961                                    50

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (ON BEHALF OF PLAINTIFFS AND THE CLASSES)

197.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth therein.

198.    DISH knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

199.    DISH's duty included a responsibility to implement processes by which it could detect and analyze a breach of its security systems in an expeditious period of time and to give prompt notice to those affected in the case of a cyberattack.

200.    DISH knew, or should have known, of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security. DISH was on notice because on information and belief it knew or should have known that a television provider that serves millions and employs hundreds of thousands of people is an attractive target for cyberattacks due to the high volume of sensitive data it stores.

201.    DISH owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to it. DISH's duties included, but were not limited to, the following:

4862-5027-4961                                    51

     a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting. and protecting Private Information in its possession;

     b. To protect PII and in some instance PHI using reasonable and adequate security procedures and systems that are compliant with the industry standards;

     c. To have procedures in place to prevent the loss or unauthorized dissemination of PII and in some instance PHI in its possession;

     d. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

     e. To promptly notify Plaintiffs and the Class Members of a data breach and to disclose the types of information compromised.

202. DISH's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant was bound by industry standards to protect confidential Private Information.

203. Plaintiffs and the Class Members were foreseeable and probable victims of any inadequate security practices and DISH owed them a duty of care not to subject them to an unreasonable risk of harm.

204. DISH, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within DISH's possession.

205.    DISH, by its actions and/or omissions, breached its duty of care by failing to provide, or by acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

206.    DISH, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then provide prompt notice of the Data Breach to those whose Private Information was compromised.

207.    DISH breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.  Failing to adequately monitor the security of its networks and systems;

c.  Failure to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards; and

d.  Allowing unauthorized access to Class Members' Private Information.

208.    DISH had a special relationship with Plaintiffs and the Class Members. Plaintiffs' and Class Members' willingness to entrust DISH with their Private Information was predicated on the understanding that DISH would take adequate security precautions. The members of the Current Employee Class, Former Employee Class, and Family and Minor Class also enjoyed a special relationship with Defendants by virtue of

4862-5027-4961

53

their current or former employment relationship. Moreover, only DISH had the ability to protect its systems (and the Private Information that it stored on them) from attack.

209.   DISH's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised.

210.   As a result of DISH's ongoing failure to notify Plaintiffs and Class Members regarding exactly what Private Information has been compromised, Plaintiffs and Class Members are unable to take all the necessary precautions to mitigate damages by preventing future fraud.

211.   DISH's breaches of duty caused a foreseeable risk of harm to Plaintiffs and Class Members to suffer from identity theft, loss of time and money to monitor their finances for fraud, and loss of control over their Private Information.

212.   As a result of DISH's negligence and breach of duties which led to the Private Information of Plaintiffs and Class Members falling into the hands of cybercriminals, Plaintiffs and Class Members have suffered and/or are at a substantial and imminent risk of suffering from the misuse of their Private Information for fraudulent purposes.

213.   DISH also maintained independent duties under state and federal laws and regulations that required it to reasonably safeguard Plaintiffs' and the Class Members' Private Information and promptly notify them about the Data Breach. DISH's failure to observe the FTCA and HIPAA are evidence of its negligent failure to safeguard Plaintiffs' and Class Members' Private Information.

214. As a direct and proximate result of DISH's negligent conduct, Plaintiffs and the Class Members have suffered damages and are at imminent risk of further harm.

215. The injury and harm that Plaintiffs and the Class Members suffered was reasonably foreseeable and was the direct and proximate result of DISH's negligent conduct.

216. Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

217. In addition to monetary relief, Plaintiffs and the Class Members also are entitled to injunctive relief requiring DISH to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and the Class.

## COUNT II
## NEGLIGENCE *PER SE*
## (ON BEHALF OF PLAINTIFFS AND THE CLASSES)

218. Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth therein.

219. Pursuant to HIPAA and Section 5 of the FTCA, DISH had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information, including PII and PHI, of Plaintiffs and Class Members.

220. Upon information and belief, DISH breached its duties by failing to employ industry standard data and cybersecurity measures to gain compliance with those laws, including, but not limited to, proper segregation, access controls, password protection,

4862-5027-4961

55

encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

221.    Plaintiffs and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect.

222.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect Private Information. The FTC publications described above, and the industry standard data and cybersecurity measures, also form part of the basis of DISH's duty in this regard.

223.    Pursuant to HIPAA, Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' PHI.

224.    Under HIPAA, Defendant had a duty to render electronic PHI into unusable, unreadable, or indecipherable form. *See* 45 C.F.R. § 164.304.

225.    DISH violated the FTCA and HIPAA by failing to use reasonable measures to protect Private Information of Plaintiffs and Class Members and by not complying with applicable industry standards, as described herein.

226.    It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to DISH's networks, databases, and computers that stored or contained Plaintiffs' and Class Members' Private Information.

4862-5027-4961

56

227.     DISH's violations of the FTCA and HIPAA constitute negligence *per se.*

228.     Plaintiffs' and Class Members' Private Information constitutes personal property that was stolen due to DISH's negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

229.     As a direct and proximate result of DISH's negligence *per se*, Plaintiffs and the Class have suffered and continue to suffer injuries and damages arising from the unauthorized access of their Private Information (including PII and PHI) because of the Data Breach, including but not limited to, damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives and the lives of their family members.

230.     DISH breached its duties to Plaintiffs and the Class Members under these laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

231.     As a direct and proximate result of DISH's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

232.     In addition to monetary relief, Plaintiffs and Class Members also are entitled to injunctive relief requiring DISH to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and the Class Members.

4862-5027-4961                                                  57

## COUNT III
## BREACH OF CONTRACT
## (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CUSTOMER, CURRENT EMPLOYEE, AND FORMER EMPLOYEE CLASSES)

233. Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth therein.

234. Plaintiffs and members of the Nationwide Customer Class, Nationwide Current Employee Class and Nationwide Former Employee Class (hereinafter "Breach of Contract Class Members" for purposes of this Count only) entered into a valid and enforceable contract when they paid money to DISH in exchange for services and/or became employed by DISH, which included promises to secure, safeguard, protect, keep private, and not disclose the Breach of Contract Class Members' Private Information.

235. DISH's Privacy Policy memorialized the rights and obligations of DISH and its customers and employees. This document was provided to the Breach of Contract Class Members in a manner and during a time when it became part of the agreement for services and/or employment.

236. In the Privacy Policy, DISH commits to using commercially reasonable efforts to protect the privacy and security of Private Information against unauthorized access and it promises to only share the Private Information with third parties in specified circumstances.

237. The Breach of Contract Class Members fully performed their obligations under their contracts with DISH.

4862-5027-4961                                    58

238.    DISH did not secure, safeguard, protect, or keep private the Breach of Contract Class Members' PII and PHI and instead allowed it to be disclosed to third parties. Therefore, DISH breached its contracts with these class members.

239.    DISH allowed third parties to access, copy, and/or transfer the Breach of Contract Class Members' Private Information without their consent and, therefore, DISH breached the Privacy Policy with the Breach of Contract Class Members.

240.    DISH's failure to satisfy its confidentiality and privacy obligations resulted in DISH providing services to the Breach of Contract Class Members that were of a diminished value.

241.    As a result, the Breach of Contract Class Members have been harmed, damaged, and/or injured as described herein.

242.    In addition to monetary relief, the Breach of Contract Class Members are entitled to injunctive relief requiring DISH to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to the Breach of Contract Class Members.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CUSTOMER,**
**CURRENT EMPLOYEE, AND FORMER EMPLOYEE CLASSES)**

243.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth therein.

244.    This Count is pleaded in the alternative to Count III above.

4862-5027-4961                                59

245.    Plaintiffs and members of the Nationwide Customer Class, Nationwide Current Employee Class and Nationwide Former Employee Class (hereinafter "Breach of Implied Contract Class Members" for purposes of this Count only) formed an implied contract with DISH for its services and/or employment through the parties' collective conduct, which included but was not limited to, Breach of Implied Contract Class Members either paying for goods, labor, and services, and/or becoming employed and working for DISH, while also entrusting DISH with their highly sensitive Private Information.

246.    Through DISH's performance of, and/or sale of labor and goods and services to the Consumer Class, or through its hiring and employment of the Employee Class, it knew or should have known that it must protect Breach of Implied Contract Class Members' confidential Private Information in accordance with DISH's policies, practices, and applicable law.

247.    As consideration, Breach of Implied Contract Class Members paid money to DISH for its services, labor and goods and/or turned over their valuable Private Information to Defendant as a condition of employment. Accordingly, Breach of Implied Contract Class Members bargained with DISH to securely maintain and store their Private Information.

248.    DISH accepted possession of Breach of Implied Contract Class Members' Private Information for the purpose of providing services to them and/or employing them.

4862-5027-4961                    60

249.    In delivering their Private Information to Defendant, Breach of Implied Contract Class Members intended and understood that DISH would adequately safeguard the Private Information as part of that service.

250.    Defendant's implied promises to Breach of Implied Contract Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; (7) complying with HIPAA standards to make sure that Breach of Implied Contract Class Members' Private Information would remain protected; and (8) taking other steps to protect against foreseeable data breaches.

251.    Breach of Implied Contract Class Members would not have entrusted their Private Information to DISH in the absence of such an implied contract.

252.    Had DISH disclosed to Breach of Implied Contract Class Members that it did not have adequate computer systems and security practices to secure sensitive data, Breach of Implied Contract Class Members would not have provided their Private Information to DISH.

253.    DISH recognized (or should have recognized) that Breach of Implied Contract Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain therewith.

254.    DISH violated these implied contracts by failing to employ reasonable and adequate security measures to secure Breach of Implied Contract Class Members' Private Information. DISH further breached these implied contracts by failing to comply with its promise to abide by HIPAA.

255.    DISH violated these contracts by failing to employ reasonable and adequate data security measures to secure Breach of Implied Contract Class Members' Private Information and by disclosing it for purposes not required or permitted under the contracts or agreements.

256.    Breach of Implied Contract Class Members have been damaged by DISH's conduct, including by paying for data and cybersecurity protection that they did not receive, entrusting DISH with valuable Private Information, and by incurring the harms and injuries arising from the Data Breach now and in the future.

**COUNT V**
**VIOLATION OF NORTH CAROLINA DECEPTIVE TRADE PRACTICES ACT**
**(ON BEHALF OF PLAINTIFF SUSAN OWEN-BROOKS**
**AND THE NORTH CAROLINA SUBCLASS)**

257.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth therein.

258.    Plaintiff Owen-Brooks, individually (hereinafter "Plaintiff" for purposes of this Count only) and on behalf of the North Carolina Subclass, brings this claim.

4862-5027-4961

259.     As alleged above, DISH engaged in unfair and deceptive acts and practices in violation of the North Carolina Deceptive Trade Practices Act, N.C. Gen. Stat. §75-1.1.

260.     North Carolina law declares unlawful all "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1.

261.     "Commerce" is defined broadly as any business activity other than "professional services rendered by a members of a learned profession." *Id.*

262.     DISH's sale of satellite television services constitutes commerce under North Carolina law.

263.     DISH engaged in unlawful, unfair, and deceptive acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the services purchased by Plaintiff and the North Carolina Subclass in violation of N.C. Gen. Stat. § 75-1.1, including but not limited to the following:

   a. DISH misrepresented material facts by representing that, in connection with its provision of services, it would maintain adequate data privacy and security practices and procedures to safeguard the Private Information from unauthorized disclosure, release, data breach, and theft;

   b. DISH omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for the North Carolina Subclass's Private Information;

   c. DISH engaged in unfair, unlawful, and deceptive acts and practices as part of its provision of commercial services by failing to maintain the privacy and

4862-5027-4961                                    63

security of the North Carolina Subclass's Private Information, in violation of

duties imposed by and public policies reflected in applicable federal and

state laws, including the FTCA, resulting in the Data Breach; and

d. DISH engaged in unlawful, unfair, and deceptive acts and practices with

respect to its provision of services by failing to take proper action following

the Data Breach to enact adequate privacy and security measures and

protect the North Carolina Subclass's Private Information from further

unauthorized disclosure, release, data breach, and theft.

264.  The above unlawful, unfair, and deceptive acts and practices on the part of DISH were immoral, unethical, oppressive, and unscrupulous. These acts and practices caused substantial injury or will cause substantial injury to individuals that they could not reasonably avoid. This substantial injury outweighs any benefits to consumers.

265.  DISH knew, or should have known, that its computer systems and data security practices were inadequate to safeguard the North Carolina Subclass's Private Information and that risk of a data breach or theft was highly likely. DISH's actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of the North Carolina Subclass.

266.  As a direct and proximate result of DISH's deceptive acts and practices, Plaintiff and members of the North Carolina Subclass suffered an ascertainable loss, including the loss of their legally protected interest in the confidentiality and privacy of their Private Information.

4862-5027-4961

64

267.    Individuals injured by unfair or deceptive acts or practices are entitled to treble damages. N.C. Gen. Stat. § 75-16. Thus, Plaintiff and the North Carolina Subclass seek and request treble damages, attorney fees, expenses, and costs, and injunctive relief pursuant to N.C. Gen. Stat. §75-1.1, *et seq.*

**COUNT VI**
**VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT**
**(ON BEHALF OF PLAINTIFF LAURA VEST**
**AND THE VIRGINIA SUBCLASS)**

268.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth therein.

269.    Plaintiff Vest, individually (hereinafter "Plaintiff" for purposes of this Count only) and on behalf of the Virginia Subclass, brings this claim.

270.    The Virginia Consumer Protection Act prohibits "[u]sing any . . . deception, fraud, false pretense, false promise or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200(14).

271.    DISH is a "person" as defined by Va. Code Ann. § 59.1-198. 1323. Defendant is a "supplier," as defined by Va. Code Ann. § 59.1-198.

272.    DISH engaged in the complained-of conduct in connection with "consumer transactions" with regard to "goods" and "services," as defined by Va. Code Ann. § 59.1-198. Defendant advertised, offered or sold goods or services used primarily for personal, family or business purposes.

273.    DISH engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise and misrepresentation in connection with consumer transactions, including:

4862-5027-4961                                          65

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Virginia Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks and adequately maintain and/or improve security and privacy measures, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Virginia Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, *et seq.*, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Virginia Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Virginia Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, *et seq.*;

f. Omitting, suppressing and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Virginia Subclass Members' Private Information; and

g. Omitting, suppressing and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Virginia Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, *et seq.*

274. DISH intended to mislead Plaintiff and Virginia Subclass Members and induce them to rely on its misrepresentations and omissions.

275. DISH's representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff and Virginia Subclass Members, about the adequacy of DISH's computer and data security and the quality of the DISH brand.

276. Had DISH disclosed to Plaintiff and Virginia Subclass Members that its data systems were not secure and, thus, vulnerable to attack, DISH would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, DISH held itself out as a large, sophisticated entity with the resources to put adequate data security protocols in place, an organization that could be trusted with valuable Private Information regarding numerous consumers, including Plaintiff and the Virginia Subclass. DISH accepted the responsibility of hosting and keeping Private Information secure while keeping the inadequate state of its security controls secret from the public. Accordingly, because DISH held itself out as having the ability to maintain a secure environment for users' email accounts with a corresponding duty of trustworthiness and care, Plaintiff and the Virginia Subclass Members acted

4862-5027-4961

67

reasonably in relying on DISH's misrepresentations and omissions, the truth of which they could not have discovered.

277.    DISH had a duty to disclose these facts due to the circumstances of this case, the sensitivity and extensivity of the Private Information in its possession and the generally accepted professional standards in its industry. In addition, such a duty is implied by law due to the nature of the relationship between consumers—including Plaintiff and the Virginia Subclass—and DISH, because consumers are unable to fully protect their interests with regard to their data and placed trust and confidence in DISH. DISH's duty to disclose also arose from its:

278.    Possession of exclusive knowledge regarding the security of the data in its systems;

    a.  Active concealment of the state of its security; and/or

    b.  Incomplete representations about the security and integrity of its computer and data systems and its prior data breaches, while purposefully withholding material facts from Plaintiff and the Virginia Subclass that contradicted these representations.

279.    The above-described deceptive acts and practices also violated the following provisions of VA Code § 59.1-200(A):

    a.  Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses or benefits;

    b.  Misrepresenting that goods or services are of a particular standard, quality, grade, style or model; and

4862-5027-4961

68

c. Advertising goods or services with intent not to sell them as advertised or with intent not to sell them upon the terms advertised.

280. DISH acted intentionally, knowingly and maliciously to violate Virginia's Consumer Protection Act and recklessly disregarded Plaintiff's and Virginia Subclass Members' rights. An award of punitive damages would serve to punish DISH for its wrongdoing and warn or deter others from engaging in similar conduct.

281. As a direct and proximate result of DISH's deceptive acts or practices, Plaintiff and Virginia Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property and monetary and nonmonetary damages, including from fraud and identity theft, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft and loss of value of their Private Information.

282. DISH's violations present a continuing risk to Plaintiff and Virginia Subclass Members as well as to the general public.

283. Plaintiff and Virginia Subclass Members seek all monetary and nonmonetary relief allowed by law, including actual damages, statutory damages in the amount of $1,000 per violation if the conduct is found to be willful or, in the alternative, $500 per violation, restitution, injunctive relief, punitive damages and attorneys' fees and costs.

4862-5027-4961                                    69

<u>**COUNT VII**</u>
**VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT
(ON BEHALF OF PLAINTIFF KIMBERLY SANDRETTO
AND THE WISCONSIN SUBCLASS)**

284.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth therein.

285.    Plaintiff Sandretto, individually (hereinafter "Plaintiff" for purposes of this Count only) and on behalf of the Wisconsin Subclass, brings this claim.

286.    DISH is a "person, firm, corporation or association," as defined by Wis. Stat. § 100.18(1).

287.    Plaintiff and Wisconsin Subclass Members are members of "the public," as defined by Wis. Stat. § 100.18(1).

288.    With the intent to sell, distribute or increase consumption of merchandise, services or anything else offered by DISH to members of the public for sale, use or distribution, Defendant made, published, circulated, placed before the public or caused (directly or indirectly) to be made, published, circulated or placed before the public in Wisconsin advertisements, announcements, statements and representations to the public which contained assertions, representations or statements of fact which are untrue, deceptive and/or misleading, in violation of Wis. Stat. § 100.18(1).

289.    DISH also engaged in the above-described conduct as part of a plan or scheme, the purpose or effect of which was to sell, purchase or use merchandise or services not as advertised, in violation of Wis. Stat. § 100.18(9).

290.    DISH's deceptive acts, practices, plans and schemes include:

4862-5027-4961

70

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Wisconsin Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Wisconsin Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Wisconsin Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Wisconsin Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Wisconsin Subclass Members' Private Information; and

4862-5027-4961

71

g. Omitting, suppressing and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Wisconsin Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

291.    DISH intended to mislead Plaintiff and Wisconsin Subclass Members and induce them to rely on its misrepresentations and omissions.

292.    DISH's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Private Information.

293.    DISH had a duty to disclose the above-described facts due to the circumstances of this case, the sensitivity and extensivity of the Private Information in its possession and the generally accepted professional standards in its industry. In addition, such a duty is implied by law due to the nature of the relationship between consumers—including Plaintiff(s) and the Wisconsin Subclass—and Defendant, because consumers are unable to fully protect their interests with regard to their data and placed trust and confidence in Defendant. Defendant's duty to disclose also arose from its:

a. Possession of exclusive knowledge regarding the security of the data in its systems;

b. Active concealment of the state of its security; and/or

c. Incomplete representations about the security and integrity of its computer and data systems and its prior data breaches, while purposefully

withholding material facts from Plaintiff and the Wisconsin Subclass that contradicted these representations.

294. DISH's failure to disclose the above-described facts is the same as actively representing that those facts do not exist.

295. DISH acted intentionally, knowingly and maliciously to violate the Wisconsin Deceptive Trade Practices Act and recklessly disregarded Plaintiff's and Wisconsin Subclass Members' rights. DISH's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

296. As a direct and proximate result of DISH's deceptive acts or practices, Plaintiff and Wisconsin Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property and monetary and nonmonetary damages, including from fraud and identity theft, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft and loss of value of their Private Information.

297. DISH had an ongoing duty to all DISH customers to refrain from deceptive acts, practices, plans and schemes under Wis. Stat. § 100.18.

298. Plaintiff and Wisconsin Subclass Members seek all monetary and nonmonetary relief allowed by law, including damages, reasonable attorneys' fees and costs under Wis. Stat. § 100.18(11)(b)(2), injunctive relief and punitive damages.

4862-5027-4961

73

## COUNT VIII
## UNJUST ENRICHMENT
## (ON BEHALF OF PLAINTIFFS AND ALL CLASSES)

299. Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth therein.

300. This Count is pleaded in the alternative to Counts III and IV above.

301. Plaintiff Owen-Brooks and the Customer Class Members conferred a benefit on DISH by paying for products and services that should have included data and cybersecurity protection to protect their Private Information. DISH did not provide such protection and Plaintiff Owen-Brooks and Customer Class Members did not receive such protection.

302. Plaintiffs Cook, Bane, Looney, and Dougherty and the Members of the Current Employee Class, the Former Employee Class, and the Family and Minor Class all conferred a benefit on DISH by entrusting it with their valuable and highly sensitive Private Information in exchange for employment and/or other benefits that include, but are not limited to, the implementation of adequate data security practices, procedures, and protocols that would be sufficient to protect such Private Information from unauthorized disclosure.

303. DISH has retained the benefits of its unlawful conduct, including by retaining Plaintiffs' and Class Members' valuable Private Information, retaining the services of the Members of the Current Employee Class and Former Employee Class, and the amounts received for data and cybersecurity practices that it did not provide. Due to DISH's

4862-5027-4961                                                    74

conduct alleged herein, it would be unjust and inequitable under the circumstances for DISH to be permitted to retain the benefit of its wrongful conduct.

304.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from DISH, and/or an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by DISH from its wrongful conduct. If necessary, the establishment of a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation may be created.

**COUNT IX**
**DECLARATORY JUDGMENT**
**(ON BEHALF OF PLAINTIFFS AND ALL CLASSES)**

305.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

306.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

307.    DISH owes a duty of care to Plaintiffs and Class Members which required it to adequately secure their Private Information.

308.    DISH still possesses Plaintiffs' and Class Members' Private Information.

309.    Plaintiffs allege that DISH's data security measures remain inadequate. Furthermore, Plaintiffs and Class Members continue to suffer injury as a result of the

4862-5027-4961

compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

310.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.  DISH owes a legal duty to secure current and former customers' and employees' (and their families') Private Information and to timely notify individuals of a data breach under the common law, HIPAA, and Section 5 of the FTCA;

b.  DISH's existing data security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to protect individuals' Private Information; and

c.  DISH continues to breach this legal duty by failing to employ reasonable measures to secure individuals' Private Information.

311.    This Court also should issue corresponding prospective injunctive relief requiring DISH to employ adequate security protocols consistent with legal and industry standards to protect current and former customers' and employees' (and their families') Private Information, including the following:

a.  Order DISH to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members; and

4862-5027-4961                                    76

b. Order DISH to comply with its explicit or implicit contractual obligations and duties of care by implementing and maintaining reasonable data security measures, including, but not limited to:

i. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on DISH's systems, on a periodic basis, and ordering DISH to promptly correct any problems or issues detected by such third-party security auditors;

ii. engaging third-party security auditors and internal personnel to run automated security monitoring;

iii. auditing, testing, and training its security personnel regarding any new or modified procedures;

iv. segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised hackers cannot gain access to other portions of DISH's systems;

v. conducting regular database scanning and securing checks;

vi. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii. meaningfully educating its current and former users and employees about the threats they face resulting from the loss of their Private

4862-5027-4961

77

Information to third parties, as well as the steps they must take to
protect themselves.

312.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury and will lack an adequate legal remedy to prevent further injury in the event of another data breach at DISH. The risk of another such breach is real, immediate, and substantial. If another breach at DISH occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

313.    The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to DISH if an injunction is issued. Plaintiffs and Class Members will likely be subjected to substantial identity theft and other related damages. On the other hand, the cost of DISH's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and DISH has a preexisting legal obligation to employ such measures.

314.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at DISH, thus preventing the additional future injury to Plaintiffs and Class Members whose Private Information would be further compromised.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Classes described above, seek the following relief:

a. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Classes as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Classes requested herein;

b. Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of Plaintiffs and Class Members as requested herein;

d. An order instructing DISH to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e. An order requiring DISH to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiffs and the Classes awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law, and

g. An award of such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all triable issues.

4862-5027-4961

79

Respectfully submitted,

Dated: November 16, 2023

*/s/ Bryan L. Bleichner*
Bryan L. Bleichner (MN BAR #0326689)
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Telephone:   (612) 339-7300
Facsimile:  (612) 336-2940
*bbliechner@chestnutcambronne.com*

Scott Edward Cole
**COLE & VAN NOTE**
555 12th Street, Suite 2100
Oakland, California 94607
Telephone:  (510) 891-9800
Facsimile:  (510) 891-7030
*sec@colevannote.com*

Mason A. Barney (admitted *Pro Hac Vice*)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Telephone:  (212) 532-1091
*mbarney@sirillp.com*

*Interim Co-Lead Counsel*

4862-5027-4961

## CERTIFICATE OF SERVICE

The undersigned attorney of record hereby certifies that the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.


Dated:November 16, 2023                    */s/ Bryan L. Bleichner*
                                           Bryan L. Bleichner (MN BAR #0326689

4862-5027-4961                             81